## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

JUNE MEDICAL SERVICES, LLC d/b/a HOPE
MEDICAL GROUP FOR WOMEN, on behalf of its
patients, physicians, and staff; and DR. JOHN
DOE 1, DR. JOHN DOE 3, and DR. JOHN DOE 7,
on behalf of themselves and their patients,

                          Plaintiffs,                          Case No:

v.

REBEKAH GEE, in her official capacity as
Secretary of the Louisiana Department of
Health; and JAMES E. STEWART, SR., in his
official capacity as District Attorney for
Caddo Parish,

                          Defendants.

## COMPLAINT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................1

JURISDICTION AND VENUE ...........................................................................4

PARTIES .............................................................................................................4
    A. Plaintiffs...................................................................................................4
    B. Defendants ...............................................................................................5

FACTUAL ALLEGATIONS .............................................................................6

    A. Under The Pretense Of Protecting Women's Health, Louisiana Has Adopted
    Onerous And Unnecessary Regulations Targeting Abortion...........................6

        i.   Louisiana Has A Long History Of Unconstitutionally Attempting To
            Restrict Access To Abortion.................................................................10
        ii.  LDH Has Improperly Exercised Its Rulemaking Authority Under OAFLL .......15
        iii. LDH Has Improperly Exercised Its Licensing Authority Under OAFLL. ..........23
        iv. LDH's OAFLL Regulations Permit Unlimited
            Warrantless Inspections Of Abortion Providers ...............................25

    B. Louisiana's Targeted Regulation of Abortion Providers
    Does Not Benefit Women's Health ..............................................................26

        i.   Abortion Is A Safe And Essential Component Of Basic Healthcare.................26
        ii.  OAFLL, As Implemented By LDH, Provides Little Or No Medical Benefit......27
        iii. The Sham Health Statutes Provide No Medical Benefit.....................................33

    C. Louisiana's Targeted Regulation Of Abortion Providers
    Substantially Obstructs Access To Abortion .............................................36

        i.   LDH's Enforcement Of OAFLL Makes Obtaining Abortion More Complex,
            Invasive, Confusing, Difficult, And Costly .......................................37
        ii.  The Sham Health Statutes Impose Similar Heavy Burdens
            And Obstacles To Access .....................................................................44
        iii. The Reduced Number Of Louisiana Abortion Providers Caused By Louisiana's
            Targeted Regulation Of Abortion Providers Further Burdens Women ..............46

FIRST CLAIM FOR RELIEF ...........................................................................50
SECOND CLAIM FOR RELIEF ......................................................................51
THIRD CLAIM FOR RELIEF ..........................................................................52
ATTORNEY'S FEES ........................................................................................52
REQUEST FOR RELIEF ..................................................................................52

Plaintiffs June Medical Services, LLC (d/b/a/ Hope Medical Group for Women) ("Hope"), on behalf of its patients, physicians, and staff; and Dr. John Doe 1, Dr. John Doe 3, and Dr. John Doe 7,[1] on behalf of themselves and their patients (together with Hope, "Plaintiffs"), by and through their undersigned attorneys, bring this complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

## PRELIMINARY STATEMENT

1.      Exactly one year ago, the United States Supreme Court affirmed that states cannot restrict access to abortion under the pretense of protecting health.  In that pivotal decision, *Whole Woman's Health v. Hellerstedt*, the Supreme Court affirmed that an abortion regulation is unconstitutional when the burdens it imposes on abortion access outweigh the benefits, if any, it confers.  136 S. Ct. 2292, 2309–10 (2016).

2.      Plaintiffs bring this suit on behalf of themselves and their patients because Louisiana has done exactly what the United States Constitution and *Whole Woman's Health* forbid: under the guise of "health and safety," Louisiana has targeted abortion providers with a series of onerous regulations that do little or nothing to promote women's health and serve only to impede access to abortion care.

3.      Plaintiffs challenge the two core components of that scheme, the Outpatient Abortion Facility Licensing Law and a series of sham health statutes, both of which are unconstitutional as applied.

---

[1] To avoid confusion, the physician plaintiffs here adopt the same John Doe numbering system as in other, ongoing litigation in this district, in which Louisiana abortion providers have been numbered John Doe 1 through 6.  *See June Med. Servs., LLC v. Gee*, No. 3:14-CV-525-JWD-RLB; *June Med. Servs., LLC v. Gee*, No. 3:16-CV-444-BAJ-RLB.  John Doe 7 is not a party to those cases.  Plaintiff physicians adopt the pseudonym "John" Doe regardless of gender.

4.      Louisiana's Outpatient Abortion Facility Licensing Law—comprising La. Rev. Stat. §§ 40:2175.1–2175.6 and the term "outpatient abortion facility" in La. Rev. Stat. § 40:2199(A)(1) (collectively, "OAFLL")—requires outpatient providers of abortion care to obtain an outpatient abortion facility license from the Louisiana Department of Health ("LDH"),[2] and to satisfy the requirements for obtaining and keeping such a license that LDH has established and enforces. Like OAFLL, the "Sham Health Statutes"[3]—located in Title 14 (the Criminal Code) and Title 40 (Public Health and Safety) of the Louisiana Revised Statutes—limit who can provide abortion care and how they can provide it.  Through this licensing and regulatory regime, LDH requires outpatient abortion facilities to comply with extensive regulations in virtually every aspect of their care and business—in ways that far exceed its regulation of providers of other similarly low-risk healthcare and that are inconsistent with acceptable medical standards.

5.      Legal abortion is extremely safe.  It does not require a multitude of specifically targeted regulations—governing buildings, medical personnel, recordkeeping, testing, counseling, and everything in between—to make it safer.

6.      Not only is abortion safe, it is already subject to regulation and oversight simply as a form of healthcare.  The doctors, nurses, and medical professionals who provide abortion care in Louisiana, or who could but for Louisiana's onerous regulations, are already subject to the State's generally applicable professional licensure, health, and tort laws and regulations; the clinics, hospitals, and doctors' offices where they provide care are also regulated and supervised by the State and professional organizations.  The additional regulation that Louisiana heaps on

---

[2] Until recently, LDH was named the Department of Health and Hospitals.  To avoid confusion, Plaintiffs use the current name and acronym throughout.

[3] As detailed *infra*, ¶ 26, the Sham Health Statutes are La. Rev. Stat. §§ 14:32.9, 32.9.1; and La. Rev. Stat. §§ 40:1061.10(A)(1), 1061.10(D)(1), 1061.11, 1061.16(B), 1061.16(C), 1061.17(B), 1061.17(C)(8), 1061.17(G), 1061.19, and 1061.21.

healthcare professionals and practices because the care they provide includes abortion—one of the safest and most common forms of medical care in the United States and one that is a constitutional right—has nothing to do with improving health outcomes and everything to do with limiting access to abortion by making it difficult or impossible to provide.

7.     Plaintiffs bring this suit because Louisiana is achieving its goal of radically restricting access to abortion in the state.  The practical effect of the State's harsh and unnecessary regulatory regime has been to drastically limit the number of healthcare providers who can offer abortion care, consolidate them into a handful of facilities, and then burden those facilities with arbitrarily enacted and enforced regulations until they close.  The effect has been to make it substantially more difficult to access abortion in Louisiana, without making it any safer.

8.     As *Whole Woman's Health* clarified a year ago, states may not infringe on Americans' constitutional right to abortion by subjecting it to sham medical regulations and by pressuring abortion facilities to close.  Where, as in Louisiana, a state's regulations burden the right to abortion in excess of any benefit to health, those burdens are "undue" and the law is unconstitutional.

9.     Plaintiffs include one of the last remaining medical facilities currently licensed to provide outpatient abortion services in the State of Louisiana and three physicians, two of whom perform abortions at that facility and one of whom would do so, but cannot because of the requirements imposed by OAFLL and the Sham Health Statutes.  On their own behalf and on behalf of their patients, Plaintiffs bring this 42 U.S.C. § 1983 action under the Fourth and Fourteenth Amendments to the U.S. Constitution to seek declaratory and injunctive relief from the unconstitutional requirements imposed by these laws.

## JURISDICTION AND VENUE

10.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3).

11.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C.

§§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal

and equitable powers of this Court.

12.     Venue is appropriate under 28 U.S.C. § 1391(b) because a substantial part of the events

or omissions giving rise to the claims occurred in this district, and Defendant Gee, who is sued in

her official capacity, carries out her official duties at offices located in this district.

## PARTIES

### A. Plaintiffs

13.     Plaintiff Hope is a women's reproductive health clinic located in Shreveport.  Hope is

one of only three remaining licensed outpatient abortion facilities in the State of Louisiana, and

has been providing reproductive healthcare, including abortion care, since 1980.  Hope is a

member of the National Abortion Federation ("NAF") and is licensed and inspected by LDH.  In

addition to providing abortion care, Hope provides pregnancy testing and counseling,

contraception, education, and referrals for prenatal care, treatment of sexually transmitted

infections, and adoption.  Hope sues on its own behalf and on behalf of its patients, physicians,

and staff.

14.     Plaintiff Dr. John Doe 1 is a board-certified physician in family medicine and addiction

medicine.  Dr. Doe 1 has over a decade of experience as a physician and is one of two clinic

physicians who regularly provide abortion care for patients at Hope.  Dr. Doe 1 sues on his own

behalf and on behalf of his patients.

15.     Plaintiff Dr. John Doe 3 is a board-certified obstetrician-gynecologist ("ob/gyn").  Dr.

Doe 3 has over forty years of experience as a physician and is one of two clinic physicians who

regularly provide abortion care for patients at Hope.  Dr. Doe 3 sues on his own behalf and on behalf of his patients.

16.     Plaintiff Dr. John Doe 7 is a board-certified surgeon with over a decade of experience as a physician.  He practices in the surgery department of a large hospital in Louisiana.  He would like to provide abortion care at Hope, but he cannot do so under OAFLL as applied by LDH, and under the Sham Health Statutes, because he is not an ob/gyn or family physician.  Dr. Doe 7 sues on his own behalf and on behalf of his patients.

17.     Drs. John Doe 1, 3, and 7 sue using pseudonyms to prevent public disclosure of their identities, which would expose them to a substantial risk of harassment, intimidation, and violence by those opposed to the lawful provision of abortion services.

### B. Defendants

18.     Defendant Rebekah Gee is the Secretary of LDH ("Secretary") and is sued in her official capacity.  LDH has the authority to issue and enforce regulations pursuant to OAFLL, and to revoke, suspend, or deny an outpatient abortion facility's license for violation of this or any law. La. Rev. Stat. § 40:2175.6.  LDH is the part of the executive branch of the State of Louisiana that is responsible for "the development and providing of health and medical services for the prevention of disease for the citizens of Louisiana," through its offices and officers.  La. Rev. Stat. 36 §§ 4, 251.  LDH thus has broad discretion to implement and enforce OAFLL and the Sham Health Statutes.

19.     LDH violates its obligation to protect and provide for the health and safety of the women of Louisiana by enacting regulations pursuant to OAFLL that harm women's health, and by enforcing those regulations and the Sham Health Statutes in a manner that serves no legitimate health interest and unduly burdens the provision of abortion care in Louisiana.

20.     Defendant James E. Stewart, Sr. is the District Attorney of Caddo Parish, in which Hope is located, and is sued in his official capacity.  Mr. Stewart has the authority to enforce OAFLL, to which criminal penalties apply under La. Rev. Stat. § 40:2199(A)(2), and the Sham Health Statutes, both La. Rev. Stat. §§ 14:32.9 and 32.9.1, which are part of the criminal code, and the challenged portions of La. Rev. Stat. §§ 40:1061.10-1061.21, to which criminal penalties apply under La. Rev. Stat. § 40:1061.29.

## FACTUAL ALLEGATIONS

**A. Under The Pretense Of Protecting Women's Health, Louisiana Has Adopted Onerous And Unnecessary Regulations Targeting Abortion**

21.     Louisiana has adopted laws that purport to protect women's health but that in fact impose harmful requirements, not supported by medical or scientific evidence, the only intent and effect of which is to place substantial obstacles in the path of women who seek abortions.

22.     At the core of Louisiana's targeted regulation of abortion providers is its outpatient abortion clinic licensing law, OAFLL.  OAFLL requires outpatient providers of abortion care to obtain an outpatient abortion facility license and to meet the requirements established and enforced by LDH for obtaining and keeping that license.

23.     LDH has applied and enforced OAFLL, through its implementing regulations, La. Admin. Code tit. 48, §§ 4401–53, to subject abortion facilities to a sweeping array of requirements that have little medical benefit and collectively serve to make abortion care more difficult and costly than comparably safe and common forms of healthcare.  LDH regulations implementing OAFLL govern virtually every aspect of a clinic's operations, from its provision of medical care and counseling to its physical plant, administration, staffing, and recordkeeping. LDH requires licensed abortion facilities to meet well over a thousand requirements, including, but not limited to:

a.  requiring patients to undergo a vaginal examination before receiving abortion care whether or not such an exam is medically indicated or would be recommended by the physician;

b.  forbidding qualified, trained physicians, including surgeons and adolescent pediatricians, from providing abortion care simply because they are not specialists in obstetrics and gynecology or family medicine;

c.  requiring the hiring of unnecessary nurses;

d.  requiring physicians to pass on to their patients irrelevant, misleading, and untruthful statements about abortion;

e.  requiring physicians to provide medication abortions in a manner inconsistent with the medication's label;

f.  forbidding patients from receiving the State's mandated pre-abortion lecture and scripted ultrasound from their own physicians, in their own communities; and

g.  requiring physicians to provide voluminous amounts of private and sensitive patient information to the State that has little or no scientific utility.

24.    In applying OAFLL, LDH has taken the position that a licensed outpatient abortion facility may be subject to suspension, revocation, or non-renewal of its license for a violation of any of the over one thousand requirements it has elected to impose, as well as any other federal, state, or local law or regulation.  LDH does not impose this level of regulation on any other providers of healthcare involving comparable risks; even much riskier procedures are more lightly regulated.

25.    LDH has also taken the position that outpatient abortion facilities must submit to inspections without a warrant, without probable cause to believe a violation of law has occurred,

7

and without an opportunity for pre-compliance review by a neutral decision-maker.  LDH regulations make no provision for protecting patient-identifying information obtained during these inspections against disclosure.

26.      Louisiana targets abortion providers through the Sham Health Statutes, in addition to OAFLL.  Where OAFLL and its implementing regulations apply only to licensed outpatient abortion facilities, these statutes apply to natural persons.  Their provisions include:

   a.  forbidding qualified, non-physician healthcare providers, such as trained nurse midwives, from providing any abortion care, La. Rev. Stat. § 14:32.9;

   b.  forbidding qualified, non-physician healthcare providers, such as trained nurse midwives, from providing medication abortion care, La. Rev. Stat. § 14:32.9.1;

   c.  forbidding qualified physicians, such as trained surgeons or adolescent pediatricians, as well as qualified, non-physician healthcare providers, such as trained nurse midwives, from providing abortion care, La. Rev. Stat. § 40:1061.10(A)(1);

   d.  forbidding a physician who is not "the physician performing the abortion" from performing the State's mandated, pre-abortion scripted ultrasound, unless he or she is the "physician's agent" and has "documented evidence that he or she has completed a course in the operation of ultrasound equipment," La. Rev. Stat. § 40:1061.10(D)(1), although such documentation is not typically given in medical school or residency;

   e.  forbidding physicians from offering medication abortion in a medically appropriate manner, including a requirement to be "in the same room and in the physical presence of the pregnant woman when the drug . . . is initially . . . provided to the pregnant woman," and a requirement to report all "serious adverse events" to the State and to the Federal Food and Drug Administration ("FDA"), La. Rev. Stat. § 40:1061.11, even though these

requirements are inconsistent with the label for Mifeprex, the only FDA-approved drug
for inducing abortion;[4]

f.   requiring abortion providers to give their patients materials published by LDH containing
false, misleading, or irrelevant statements regarding the supposed psychological impact
of abortion; to obtain certifications from their patients that they have received those
materials; and to keep copies of those certifications in their patients' medical records for
at least seven years, La. Rev. Stat. § 40:1061.16(B)–(C);

g.   requiring abortion providers to pass on to their patients numerous false, misleading, or
irrelevant statements regarding abortion, and to give their patients materials published by
LDH containing false, misleading, or irrelevant statements regarding abortion, such as a
thoroughly discredited connection with breast cancer, La. Rev. Stat. § 40:1061.17(B);

h.   requiring abortion providers to link to their websites an LDH website containing
numerous false, misleading, or irrelevant statements about abortion, such as a thoroughly
discredited connection with breast cancer, La. Rev. Stat. § 40:1061.17(C)(8);

i.   requiring abortion providers to certify that they have given their patients LDH's
published materials containing numerous false, misleading, or irrelevant statements about
abortion, La. Rev. Stat. § 40:1061.17(G);

j.   requiring abortion providers to keep copies of this certification, every other signed, state-
mandated consent form and certification, and the State-mandated abortion report, in each
abortion patient's medical record for at least seven years, La. Rev. Stat. § 40:1061.19;
and

---

[4] This statute also imposes numerous requirements on medication abortion that are redundant with statutes
applicable to abortion generally, serving solely to increase applicable penalties and compliance burdens on
physicians who provide medication abortion.

k. requiring abortion providers to report twenty-five data points to LDH regarding each
abortion patient, plus copies of every certification and state-mandated consent form
signed by the patient, plus an image of the patient's ultrasound, plus an additional report
if the patient experiences a complication, all within thirty days of the patient's abortion,
La. Rev. Stat. § 40:1061.21. LDH then takes years to make a summary of a limited
subset of the submitted data available to the public on its website.

27. Each of the statutes identified, *supra* ¶ 26, (collectively, the Sham Health Statutes)
purports to regulate abortion in the name of health, but either does nothing to advance health or
is in fact detrimental to health.

28. OAFLL and the Sham Health Statutes, as enforced by LDH, impose heavy burdens on
the provision of abortion in Louisiana and are unnecessary and detrimental to women's health.

29. Due to LDH's burdensome application of OAFLL and to the Sham Health Statutes,
Louisiana's primary care providers do not and cannot offer abortion care in their offices.
Instead, virtually all legal abortions in the state are offered in the state's three remaining licensed
abortion facilities. These facilities—Plaintiff Hope, in Shreveport; Women's Health Care
Center, Inc., in New Orleans; and Delta Clinic of Baton Rouge, Inc., in Baton Rouge—are the
only outpatient abortion facilities in Louisiana, a state of approximately 4,681,666 residents.

30. Upon information and belief, these three clinics provide ninety-nine percent or more of
the abortions lawfully performed in the State of Louisiana.

> **i.  Louisiana Has A Long History Of Unconstitutionally Attempting To
> Restrict Access To Abortion**

31. OAFLL and the Sham Health Statutes are the latest effort in Louisiana's long history of
marginalizing, ostracizing, and impeding women who seek abortion and the healthcare workers
who provide it.

32.     It is the policy of the State of Louisiana that no woman should ever be allowed to have an abortion, except to prevent her death, and that any physician who provides an abortion should be imprisoned.  This includes women who suffer rape, incest, a lethal fetal anomaly, or a serious health problem that does not risk death.  La. Rev. Stat. § 40:1061.

33.     Louisiana first declared abortion a crime in 1855.  Prior to *Roe v. Wade*, 410 U.S. 113 (1972), Louisiana was among a small minority of states that prohibited all abortions almost without exception.  *See* La. Rev. Stat. § 14:87 (1964).

34.     In the 1950s and 1960s, despite the development of antibiotics and improvements in prenatal care, a surge in the number of American women seeking illegal abortion created a public health crisis of increasing maternal mortality rates.  But Louisiana refused to alter its laws. While many states responded to the increase in maternal deaths by allowing abortion in a broader set of circumstances and regulating it as any other form of medical care—as many physicians demanded—Louisiana was one of the very few states to refuse any accommodation for women's health.  Instead, Louisiana retained its criminal ban on abortion almost without exception.

35.     Louisiana's ban on legal abortion forced many women in the state to forego abortion entirely or to obtain it illegally at great personal risk.  Many women who were forced to turn to illegal methods died as a result.

36.      It was only after *Roe*—and litigation forcing Louisiana to follow *Roe*—that Louisiana's criminal abortion ban, La. Rev. Stat. § 14:87, was struck down as unconstitutional and enjoined from enforcement.  *See Weeks v. Connick*, Nos. 73-469, 74-2425, 74-3197 (E.D. La. 1976); *Rosen v. La. State Bd. of Med. Examiners*, 380 F. Supp. 875 (E.D. La. 1974).

37.     Ever since *Roe*, the State has consistently and zealously attempted to outlaw abortion or impose medically unsupported restrictions intended to impede access to it.

11

38.     The State's regulation of abortion has not been motivated by, nor has it served to further, patient health.  Rather, it has been intended to regulate abortion out of existence, as proponents of the State's abortion regulations have repeatedly made clear.

39.     As Rep. Frank Hoffmann, the author of many of the laws challenged here, has stated on several occasions, "We've been named the top pro-life state in America . . . and we do it through making it tough to get an abortion in Louisiana."

40.     Federal courts have repeatedly stopped the State's attempts to revive its nineteenth-century laws preventing women from deciding to obtain legal abortions.

41.     In 1979, for example, the Legislature enacted laws that imposed a licensing scheme for all abortion facilities, permitted records and facilities inspections by LDH at any time, imposed recordkeeping and reporting obligations, forced doctors and clinics to follow state-mandated lecture requirements, and imposed the hospitalization of all women seeking second trimester abortion.  These laws in turn were struck down.  *Margaret S. v. Edwards*, 488 F. Supp. 181 (E.D. La. 1980).

42.     In response, the Legislature passed a law establishing the State's intention to restrict abortion for its own sake, by adopting a provision stating that it intended "to regulate abortion to the extent permitted by the decisions of the United States Supreme Court."  La. Rev. Stat. § 40:1299.35.0.

43.     In 1984, the Legislature enacted another grab bag of abortion restrictions, including once again a requirement to hospitalize all second trimester abortion patients.  It was again struck down.  *Margaret S. v. Treen*, 597 F. Supp. 636, 657 (E.D. La. 1984).

44.     In 1989, the Attorney General brought an action to lift an injunction against Louisiana's criminal ban on abortions.  He was unsuccessful.  *Weeks v. Connick*, 733 F. Supp. 1036 (E.D. La. 1990).

45.     In 1991, the Legislature banned abortion again.  This ban was struck down.  *Sojourner T v. Edwards*, 974 F.2d 27 (5th Cir. 1992), *cert. denied*, 507 U.S. 792 (1993).

46.     In 1997, the Legislature banned the most common methods of abortion.  This ban was struck down.  *Causeway Med. Suite v. Foster*, 43 F. Supp. 2d 604 (E.D. La. 1999), *aff'd*, 221 F.3d 811 (5th Cir. 2000).

47.     In 1999, the Legislature amended the State's law regulating ambulatory surgical centers to remove a provision clarifying that it did not apply to outpatient abortion facilities; it passed a further requirement allowing LDH to conduct warrantless inspections of abortion facilities without probable cause or consent.  La. Rev. Stat. §§ 40:5, 8.

48.     These laws were again challenged.  A federal district court enjoined the surgical center requirement, finding that the "regulations here *do not address or consider the level of care* presently provided and *do not address or consider the safety and low risk of abortion procedures* provided . . . . The new licensing requirement *is merely an extra layer of regulation designed to burden the patient* and the providers."  *Causeway Med. Suite v. Foster*, No. CIV. 99-2069 (E.D. La. Aug. 9, 1999) (Dkt. No. 15 at 45–60) (ruling in open court), *summ. j. granted in part*, (E.D. La. Aug. 8, 2000) (emphasis added).  In a parallel case, the court partially enjoined the enforcement of the warrantless inspection law, holding that State officials may inspect clinics only if the clinic consents to the inspection or if the officer obtains a search warrant from a court.  *Causeway Med. Suite v. Foster*, No. 99-0509 (E.D. La. Jul. 21, 1999) (Dkt. No. 24).  In a

settlement agreement resolving the case, the State stipulated that it would inspect clinics only "after obtaining consent or an order or warrant issued by a state district court." *Id.* (Dkt. No. 33).

49.     Defendant Gee is a party to this agreement, as she is the successor in office of then-Secretary David Hood, who entered into the agreement in his official capacity, on behalf of himself and his successors in office.

50.     OAFLL, enacted in 2001 as Act 391, is merely among the most recent iterations of Louisiana's century-and-a-half long crusade to deny women access to abortion care without regard to their health or constitutional rights.

51.     Rather than restricting abortion directly, as in most prior legislation, OAFLL authorizes LDH to issue and enforce regulations "to provide for the health, safety, and welfare of women in outpatient abortion facilities and for the safe operation of such facilities." La. Rev. Stat. § 40:2175.2.  On its face, OAFLL purports to recognize constitutional limits as well as women's health concerns by specifically providing that the rules adopted and implemented by LDH "shall be reasonably related to the purpose expressed in this Section and shall not impose a legally significant burden on a woman's freedom to decide whether to terminate her pregnancy." *Id*.

52.     Yet the very same law made it a crime—for the first time—to provide abortions without an abortion facility license, imposing on abortion providers an extensive licensing regime with which they must comply or face criminal prosecution and sanctions.

53.     OAFLL was amended and revised in 2010 by Act 490, which provided that the Secretary "may deny a license, may refuse to renew a license, or may revoke an existing license, if an investigation or survey determines that the application or licensee is in violation of *any provision*" of the regulations governing outpatient abortion facilities, "or in violation of *any other federal or state law or regulation*." La. Rev. Stat. § 40:2175.6(G) (emphasis added).

54.     On its face and as applied by LDH, Act 490 effectively allows LDH to shut down any outpatient abortion facility for *any* violation of *any* provision of *any* law or regulation, no matter how small or irrelevant to patient health or clinical care.  By comparison, in order to suspend or revoke a hospital's license, LDH must establish a "*substantial failure* of the applicant or licensee to comply" with *specific* statutory and regulatory provisions.  La. Rev. Stat. § 40:2110(A) (emphasis added).  None of those limiting factors are part of OAFLL.  La. Rev. Stat. § 40:2175.6(G).

55.     As a result, outpatient abortion facilities not only face criminal sanctions if they operate without the required license—they also face the constant risk that their licenses may be revoked or suspended without notice based on a violation of *any* provision of *any* federal or state law or regulation, no matter how minor.

> **ii.     LDH Has Improperly Exercised Its Rulemaking Authority Under OAFLL**

56.     LDH has exercised its regulatory authority pursuant to OAFLL to create an environment of unpredictable, constantly shifting, and arbitrarily enforced regulations.  Since OAFLL was passed, LDH has adopted dozens of "emergency" regulations, comprising thousands of individual requirements.  It has rescinded many of these after allowing them to take effect for a period of time.  Conversely, it has allowed others to lapse, permitting the earlier regulations to take effect for a period of time, only to then re-enact them.  It has also expanded the regulations currently in force to four times their original size, in response to no changed scientific or medical information regarding abortion safety.

57.     LDH has further abused its authority by conducting warrantless, unreasonable inspections regarding compliance with these regulations and summarily suspending or revoking the licenses of various licensed outpatient abortion facilities, including Plaintiff Hope, for alleged violations.

15

58.     OAFLL's actions have made it virtually impossible for most outpatient abortion facility licensees to keep their doors open in Louisiana.  Louisiana is now as close as it has ever been since *Roe* to outlawing abortion in practice, with the State having effectively banned most healthcare facilities from providing abortion, other than in a few narrow circumstances, and having reduced the number of licensed outpatient abortion facilities to three.

59.     LDH has wielded OAFLL in the same way that Texas authorities used the legislation struck down in *Whole Woman's Health*: as "a brutally effective system of abortion regulation that reduces access to abortion clinics thereby creating a statewide burden for substantial numbers of . . . women."  46 F. Supp. 3d 673, 684 (W.D. Tex. 2014), *aff'd*, 136 S. Ct. 2292 (2016).  Texas House Bill 2, however, shuttered only about half of Texas's abortion clinics.  136 S. Ct. at 2313.  By contrast, since the passage of OAFLL, over three-quarters of Louisiana's licensed abortion facilities have closed, quietly, one at a time.

60.     LDH was first tasked with promulgating OAFLL regulations when Act 391 was signed into law in June 2001.  LDH initially took nearly two years to draft the regulations, which took effect in May 2003 (the "2003 Regulations").  These regulations—spanning 6 pages—imposed facility licensing procedures and detailed requirements regarding personnel, pre- and post-operative procedures, patient records, and physical environment, among other areas.  29 La. Reg. 902–908 (June 20, 2003).

61.     On October 20, 2012, LDH issued a decree of emergency, amending the regulations to require, for the first time, effective immediately, a licensed abortion facility to "provide nursing services" (the "2012 Emergency Regulations").  38 La. Reg. 2457 (Oct. 20, 2012).  A decree of emergency means that the Administrative Procedure Act's notice-and-comment procedure does not apply.

16

62.     On information and belief, this regulation was issued just two years after LDH determined that a licensed outpatient abortion facility did not need *any* licensed nurses on staff to meet patient needs.

63.     The 2012 Emergency Regulations imposed additional requirements for licensed facilities to facilitate LDH's warrantless searches and added licensure liability for violations of any federal, state, or local rule or law.

64.      No emergency existed, and no justification of the emergency was articulated in the declaration of emergency accompanying the 2012 Emergency Regulations.

65.     The required "nursing services" were not medically necessary, as LDH had already determined.

66.     The 2012 Emergency Regulations went into effect immediately, providing licensed abortion facilities zero days to hire any nurses necessary to satisfy the new requirement to provide nursing services.

67.     LDH twice reenacted the 2012 Emergency Regulations, by further declarations of emergency, each time without an actual emergency and without justification of the emergency. 39 La. Reg. 1234 (May 20, 2013); 39 La. Reg. 18 (Jan. 20, 2013).  LDH eventually adopted the regulations permanently, effective August 2013 (the "2013 Amendments").  39 La. Reg. 2280 (Aug. 20, 2013).

68.     Also in 2012, LDH issued an emergency regulation that applicants for a new outpatient abortion facility license would be required to conduct a "facility need review" demonstrating that the facility was "needed."  38 La. Reg. 1961 (Aug. 20, 2012).

69.     LDH cited as authority for this rulemaking La. Rev. Stat. § 40:2116, a statute applicable to nursing homes and other residential and day care facilities, but not abortion facilities.

17

70.     No emergency existed, and no justification of the emergency was articulated in the declaration of emergency accompanying the regulation.

71.     In 2013, LDH drastically expanded its OAFLL regulations when, again by declaration of emergency, it promulgated entirely new and much more detailed licensing standards (the "2013 Emergency Regulations"), completely repealing and replacing the 2003 Regulations, as amended by the 2013 Amendments, and more than tripling them in length.  *See* 39 La. Reg. 2982–3002 (Nov. 20, 2013).

72.     As before, no emergency existed, no justification of the emergency was articulated in the declaration of emergency accompanying the publication, and licensed abortion facilities were given zero days to come into compliance with the new regulations.  LDH stated only that the purpose of the emergency rulemaking was "to promote the health and welfare of Louisiana citizens by assuring the health and safety of women seeking health care services at licensed abortion facilities."

73.     Like the current OAFLL regulations, the 2013 Emergency Regulations imposed various onerous and medically unnecessary requirements on abortion care and added a provision permitting LDH to *immediately* suspend a facility's license upon a determination that the facility has violated its rules.

74.     The 2013 Emergency Regulations also imposed certain requirements that effectively prevented lawful abortion care, notably including a one-month mandatory pre-abortion waiting period, implemented via a requirement that certain compulsory blood tests "shall be performed at least 30 days prior to the abortion procedure."  39 La. Reg. 2996 (Nov. 20, 2013).  Abortion facilities that did not force their patients to wait the requisite thirty days risked losing their licenses.

75.     On December 20, 2013 (the Friday before the Christmas holiday), LDH published a

Notice of Intent to adopt permanent regulations identical to the 2013 Emergency Regulations.

39 La. Reg. 3361 (Dec. 20, 2013).  In response, LDH received thousands of comments opposing

the changes.  The day before the new permanent regulations were due to take effect, on February

20, 2014, LDH published another declaration of emergency, again without an actual emergency

or justification of the emergency, this time rescinding the 2013 Emergency Regulations.  40 La.

Reg. 203 (Feb. 20, 2014).  The governing regulations thus immediately reverted back to the 2003

Regulations, as amended by the 2013 Amendments.

76.     Exactly one year later (the Saturday before the Christmas holiday), LDH published a

Notice of Intent to repeal the existing licensing standards and replace them with permanent

regulations substantially similar to the 2013 Emergency Regulations.  40 La. Reg. 2262 (Dec. 20,

2014).  LDH claimed the overhaul was intended to "incorporate the changes imposed by

legislation" enacted by the Louisiana Legislature since 2010, even though after 2010 the

Legislature had not enacted any substantial changes to the statutes governing the areas addressed

by the proposed new regulations.

77.     Although LDH once again received thousands of public comments and heard testimony,

in opposition to the proposed regulations, including substantive legal comments describing the

significant burdens on patients and providers that they would impose, this time it disregarded

those concerns and published the regulations as final rules.  41 La. Reg. 685–707 (Apr. 20, 2015)

(the "2015 Regulations").  The 2015 Regulations dramatically expanded and revised the 2003

Regulations, almost quadrupling their length to 22 pages.

78.     Simultaneously, pursuant to LDH's "facility need review" requirement, *see supra* ¶¶ 68–

70, Planned Parenthood Center for Choice submitted a 74-page application for facility need

19

review approval for a new licensed abortion facility in New Orleans, estimating it would fill an unmet need for several thousand women.

79. LDH received the application on October 20, 2014 and denied it on January 8, 2015.

80. Then, on June 19, 2015, LDH adopted another emergency regulation, again without an actual emergency or a justification for the emergency rulemaking, purporting to rescind the requirement that an applicant for an outpatient abortion facility license receive facility need review approval. 41 La. Reg. 1238 (July 20, 2015).

81. LDH undertook this action three days before the start of a trial regarding Louisiana's unconstitutional hospital admitting privileges requirement for abortion providers, which would have closed all but one of the state's licensed abortion facilities. *See June Med. Servs., LLC v. Gee*, No. 3:14-cv-525.

82. Despite LDH's emergency rulemaking and the LDH Secretary's sworn trial testimony that the requirement was "rescinded immediately," LDH has in fact retained the requirement of a "facility need review approval letter" in its OAFLL regulations governing applications for a new outpatient abortion facility license.

83. Upon information and belief, nearly three years after initially submitting its facility need review approval application, Planned Parenthood Center for Choice has yet to receive an outpatient abortion facility license.

84. Also upon information and belief, *no* new outpatient abortion facility has received a license since at least 2008.

85. LDH also has a history of failing to timely issue the materials that healthcare providers are required by law to give to their patients as a condition of performing abortion legally. For example, La. Rev. Stat. § 40:1061.1.2 requires a physician to give patients "an informational

document including resources, programs, and services for pregnant women who have a diagnosis of fetal genetic abnormality and resources, programs, and services for infants and children born with disabilities," which LDH is supposed to write; the statute does not include an exemption for when the document is unavailable because LDH has yet to write it. Nevertheless, while this statute took effect on June 17, 2016, over a year later, LDH has yet to write the document.

86. LDH similarly took a year or more to draft the "Women's Right to Know" pamphlet that abortion providers are required to provide to their patients by La. Rev. Stat. § 40:1061.17(B).

87. In the most recent example of LDH's improper rulemaking, on December 3, 2016 (a Saturday), LDH once again adopted immediately effective emergency regulations (the "2016 Emergency Regulations"), adding yet more requirements to the existing regulatory scheme. *See* 42 La. Reg. 2139–41 (Dec. 20, 2016). Some of those regulations were renewed once by emergency rulemaking effective April 3, 2017. 43 La. Reg. 502 (Mar. 20, 2017). LDH allowed others to lapse by operation of law (an emergency regulation may last no more than 120 days, La. Rev. Stat. § 49:954(B)(2)), and then reinstated them by emergency rulemaking effective April 21, 2017. 43 La. Reg. 872 (May 20, 2017). In none of these cases was there an actual emergency or justification offered by LDH for the emergency rulemaking.

88. The examples of LDH's use of the rulemaking procedure to burden abortion are not intended to be exhaustive as described herein, ¶¶ 56–87; there are many other examples that are not specifically discussed in this Complaint.

89. Due to the unpredictable regulatory environment created by LDH's inconsistent rulemaking and interpretation and application of its own rules, licensed abortion facilities exist in a state of constant uncertainty, where planning is difficult and necessary relationships with third-parties such as vendors and outside physicians are hard to maintain.

90.     The uncertainty created by LDH's inconsistency in making, applying, and enforcing rules dissuades and frustrates potential abortion facility licensees from opening new licensed facilities and incentivizes existing licensees to give up and return their licenses rather than continue to try to stay open and combat the chaos LDH creates.

91.     In addition to the burdens imposed by LDH's issuance and withdrawal of regulations randomly, without notice, and without time to come into compliance, the content of LDH's regulations also imposes heavy compliance burdens on Plaintiffs and other abortion providers.

92.     Taken together, LDH's OAFLL regulations impose over one thousand separate mandates on licensed facilities, governing personnel, internal policies, physical plant, reporting, and recordkeeping.

93.     For example, OAFLL regulations include expansive requirements for facility personnel, including over 175 requirements regarding the facility's required "governing body," over 150 requirements regarding the required medical director, over 60 requirements regarding the required administrator, and over 50 requirements regarding the required nursing staff.  They require a "quality assurance and performance improvement" team, which must meet quarterly, develop written policies, and perform dozens of enumerated individual responsibilities.  They impose over 20 individual requirements for performing the State-mandated, pre-abortion scripted ultrasound.  Even the basic principle of informed consent is governed by over 40 individual mandates.

94.     Many of the requirements are self-evidently pointless.  For example, among the 54 enumerated requirements applicable to the medical records of "all patients," LDH mandates an "anesthesia report" and an "operative report"—even though the medication abortion patients that

comprise nearly half of Hope's abortion patients do not, by definition, receive anesthesia, nor do they have an operation.

### iii.    LDH Has Improperly Exercised Its Licensing Authority Under OAFLL

95.    OAFLL states that "[a]n outpatient abortion facility may not be established or operated in this state without an appropriate license."  La. Rev. Stat. § 40:2175.4(A).  The statute, La. Rev. Stat. § 40:2175.6(A)-(E), and LDH's implementing regulations and enforcement practices create a complex licensing application process for both initial licensing and renewals.

96.    Under LDH's rules, an outpatient abortion facility must first submit an application that requires eight different documents, plans and specifications for approval by LDH, and "any other documentation or information required by the department for licensure," along with a licensing fee of $600.  These documents include:

    a.   a completed outpatient abortion facility initial licensing application and the non-refundable initial licensing fee;

    b.   a copy of the approval letter of the architectural facility plans for the outpatient abortion facility by the Office of State Fire Marshal;

    c.   a copy of the Office of State Fire Marshal's on-site inspection report with approval for occupancy;

    d.   a copy of the health inspection report from LDH's Office of Public Health;

    e.   an organizational chart identifying the name, position, and title of each person composing the governing body and key administrative personnel;

    f.   a floor sketch or drawing of the premises to be licensed;

    g.   "pursuant to R.S. 40:2116, a copy of the facility need review approval letter;" and

    h.   any other documentation or information required by the department for licensure, including but not limited to, a copy of any waiver approval letter, if applicable.

23

97.     After the facility submits its complete initial licensing application, it must then pass an on-site inspection and will be granted a license only if LDH finds that the facility "meets the requirements established under [the statute] and the licensing standards adopted in pursuance thereof."  La. Rev. Stat. § 40:2175.6(C).

98.     The Secretary may deny a license if the facility "is in violation of any provision" of OAFLL, of LDH's OAFLL regulations, or "of any other federal or state law or regulation."  La. Rev. Stat. § 40:2175.6(G).

99.     Under LDH's rules, licenses are tied to the facility's physical address and cannot be "subject to sale, assignment, donation, or other transfer."

100.    La. Rev. Stat. § 40:2175.6(D) requires that each outpatient abortion facility renew its license annually.  To do so, the facility must submit another application and $600 fee.  It must also submit a copy of the most current on-site inspection report with approval for occupancy from the Office of the State Fire Marshal and a copy of the most recent health inspection report from the Office of the State Fire Marshal along with any other documentation required by LDH. Further, LDH may conduct another on-site inspection.  La. Rev. Stat. § 40:2175.6(D).  Renewal will be granted if LDH finds that the facility "meet[s] the requirements established under [the statute] and the licensing standards adopted in pursuance thereof."  *Id.*

101.    Once a facility is licensed, the Secretary may immediately suspend its license if an inspection by LDH determines that the facility "is in violation of any provision" of OAFLL, of LDH's OAFLL regulations, or "of any other federal or state law or regulation" and the Secretary determines that the violation poses "an imminent or immediate threat to the health, welfare, or safety of a client or patient."  La. Rev. Stat. § 40:2175.6(H).

102.    If an outpatient abortion facility license is revoked or surrendered, or a requested renewal

is denied, then any owner, officer, member, manager, director, or administrator of the facility

may be prohibited from owning, managing, or operating another outpatient abortion facility in

Louisiana. *See* La. Rev. Stat. § 40:2175.6(I).

> iv.    **LDH's OAFLL Regulations Permit Unlimited Warrantless Inspections Of Abortion Providers**

103.    A licensed abortion facility is subject to inspection by LDH.  LDH has broadly

interpreted its ability to conduct inspections and frequently conducts warrantless inspections of

abortion clinics.  Since 2003, under its authority pursuant to OAFLL, LDH has conducted

numerous warrantless inspections of abortion clinics.

104.    To conduct its inspections, LDH purports to rely on the provision of OAFLL stating that

LDH "may perform an on-site inspection at reasonable times as necessary to ensure compliance"

with the licensing laws.  La. Rev. Stat. § 40:2175.6(F).  The inspections take the form of on-site

surveys, including initial licensing and annual re-licensing surveys, surveys in response to

complaints made by any person, and follow-up surveys to ensure compliance with any plans of

correction made in response to deficiencies alleged in prior surveys.

105.    OAFLL and LDH's implementing regulations contain no limitation on the number of

inspections LDH may perform and require no notice to the clinic prior to inspection.  LDH

regulations mandate that a facility "allow department surveyors access to" virtually anything,

including "any and all requested documents and information on the licensed premises, including

but not limited to patient medical records," interviews with "any staff or other persons," and "all

books, records or other documents maintained by or on behalf of the outpatient abortion facility."

106.    No opportunity for pre-compliance review by a neutral decision-maker is afforded.

107.    LDH's OAFLL regulations do not establish any safeguards limiting the use of private, confidential, and/or patient-identifying information obtained during surveys, nor who has access to this information.

**B.  Louisiana's Targeted Regulation Of Abortion Providers Does Not Benefit Women's Health**

**i.     Abortion Is A Safe And Essential Component Of Basic Healthcare**

108.    Legal abortion is a common and critical component of basic healthcare.  It is one of the safest procedures in contemporary medical practice.

109.    Approximately three out of ten American women will obtain an abortion.

110.    There are generally two methods of performing an abortion: by medication and by procedure.  The former is called "medication abortion" and the latter "surgical abortion."

111.    Medication abortion typically involves the ingestion by mouth of two medications—mifepristone (brand name Mifeprex) and misoprostol (brand name Cytotec)—a day or two apart.  In a typical medical abortion, the patient ingests the first medication at the facility and takes the second medication later outside the facility.  The pregnancy is passed outside the facility.

112.    Surgical abortion in the first trimester typically involves the use of suction instruments passed through the vaginal canal to empty the uterus.  Other names for this procedure include vacuum aspiration and suction curettage.  After about the fifteenth week, depending on the provider and the patient, additional instruments may be used, and this procedure can be referred to as dilation and evacuation or D&E.  Surgical abortion is a straightforward, brief procedure and is almost always performed in an outpatient setting.

113.    A first trimester surgical abortion procedure typically takes about five minutes.

114.    A surgical abortion does not require any incision or general anesthesia.  An analgesic such as ibuprofen, an anxiolytic such as Valium, a local anesthetic, and/or minimal sedation may

be used during or prior to the procedure.  The absence of incision and the introduction of instruments through a body cavity also means that surgical abortion is a clean, non-sterile procedure that does not need to be performed in an operating room.

115.    Abortion, both medication and surgical, is one of the safest procedures in contemporary medical practice.  Serious complications are very rare: less than 0.3 percent of abortion patients experience a complication that requires hospitalization, and the mortality rate from abortion provided by a medical professional is less than one per 100,000—far lower than the mortality rate associated with pregnancy and childbirth.

116.    Potential complications present health risks to women throughout pregnancy.  The risks of carrying a pregnancy to term and of childbirth are far greater than those associated with abortion—approximately 14 times greater nationally.

117.    Abortion is as safe, if not safer, than many common outpatient procedures, including colonoscopies, penicillin injections, numerous cosmetic procedures, and *any* surgical or dental procedure requiring general anesthesia.  Complications arising from first trimester surgical abortion occur in about 0.89 percent of patients, and only 0.05 percent of first trimester abortion patients experience a major complication requiring treatment at a hospital.  By comparison, vasectomy, a minor surgical procedure frequently performed in a doctor's office, has a complication rate of 2 percent, more than double that of surgical abortion, and of major complication requiring hospitalization of 0.4 percent, more than 8 times higher than that of surgical abortion.

        **ii.    OAFLL, As Implemented By LDH, Provides Little Or No Medical Benefit**

118.    The requirements LDH imposes on abortion clinics' provision of care through OAFLL are not medically necessary and confer minimal if any health benefits beyond the State's

27

generally applicable health-professional licensure laws, regulations of doctors' offices, and tort laws, which by definition also govern the provision of abortion care by health professionals.

119.    LDH's regulations implementing OAFLL lack a scientific basis and are arbitrary.  Many of them are at odds with LDH's own statements about abortion safety or those made by other regulatory and standard-setting bodies, including the Louisiana Board of Medical Examiners ("LSBME"), the American College of Obstetricians and Gynecologists ("ACOG"), and NAF.

120.    Among many examples, LDH's OAFLL regulations provide that only ob/gyns or family physicians, or residents training under them, may perform abortions.  This deprives women of their choice of provider and unnecessarily narrows the number and nature of providers that an abortion facility, like Hope, can employ.

121.    This requirement prohibits most healthcare providers who possess, or could acquire, the necessary education and training to provide abortion services from doing so.

122.    A wide variety of healthcare providers, including but not limited to surgeons, adolescent pediatricians, and advance practice clinicians (such as nurse practitioners or certified nurse midwives) can be trained to provide abortion care as safely and effectively as ob/gyns or family physicians.

123.    Conversely, learning how to perform an abortion is not a part of most family practice residencies, and no knowledge of abortion care is required to maintain a family practice board certification.

124.    In 2008, LSBME informed Hope that education and training, and not credentialing, determines competence in performing safe and effective abortions.

125.    LDH requires licensed abortion facilities to hire a licensed registered nurse ("RN") to be a Head of Nursing and tasks that individual with dozens of enumerated responsibilities.

126.    In 2010, LDH affirmed in an administrative proceeding that it was not necessary for an abortion clinic to hire *any* nurses to meet patient needs.  LDH's OAFLL regulations require dozens of enumerated responsibilities for the Head of Nursing, none of which actually need to be performed by a nurse.

127.    Despite the lack of medical necessity, Hope has had to hire additional nursing staff to ensure that an RN is monitoring vital signs during each abortion procedure, as required by LDH.

128.    LDH's OAFLL regulations impose numerous requirements on medication abortion that have no scientific basis or health purpose.  These include the requirement that a physician be in the room when a patient is given the medication and restrictions on the kinds of healthcare providers who are authorized to provide medication abortion to their patients.

129.    Similarly, LDH's OAFLL regulations arbitrarily require that the compulsory pre-abortion scripted ultrasound be performed either by "the physician who performs the abortion" or an individual who is the physician's "agent" and who has documented proficiency in using an ultrasound machine.  Medical schools and residencies do not typically issue such documentation.

130.    There is no evidence that a trained physician is less able to satisfy this requirement than a technician with a certificate.  Likewise, there is no evidence that a trained physician who does not ultimately provide the abortion is any less qualified to provide the mandated ultrasound than the physician who ultimately does.  There is also no evidence in support of the physician's agent requirement.

131.    The physician's "agent" requirement and the "physician in the room" requirement applicable to medication abortion deprive patients of the ability to receive medical care in a variety of modern ways—ways that LDH allows patients to benefit from in non-abortion contexts.  For example, patients can and frequently do receive ultrasounds from technicians or

other capable healthcare providers, who then electronically send the results to the patients'
physicians—but LDH makes this illegal for abortion.  Likewise, patients can be and frequently
are given pills or tablets by healthcare providers under the guidance and supervision of their
physicians—but LDH makes this illegal for abortion.  Depriving patients of twenty-first century
means of interacting with healthcare providers and receiving medical care provides no medical
benefit.

132.    At the same time, some of LDH's numerous OAFLL regulations require physicians to not
follow the standard of care and to forego the exercise of their medical judgment.  For example,
LDH's OAFLL regulations require verification and gestational dating of an intrauterine
pregnancy by three different methods—a compulsory vaginal examination, a compulsory urine
or blood test, and a compulsory ultrasound—whether or not the patient's healthcare provider
thinks the use of all three methods is necessary.  This provides no medical benefit.

133.    Likewise, LDH requires an Rh factor blood test for every abortion patient at a licensed
abortion facility, even though a person's blood type remains the same throughout her life, and
thus a physician may judge that no test is necessary where a patient's blood type is already
known.  This provides no medical benefit.

134.    Some of LDH's requirements further violate the ordinary norms of medical care by
requiring physicians to offer their patients misinformation.  For example, the written materials
that LDH writes and obliges abortion facilities to give to their abortion patients contain
numerous irrelevant, false, or misleading statements.[5]  Examples of these include statements
falsely associating abortion with breast cancer and depression, and numerous incorrect
statements supposedly about medication abortion, such as that it is "designed to end pregnancies

---

[5] These statements also appear on LDH's website, to which LDH requires abortion facilities link their websites.

up to 49 days after the last menstrual period," that "[a]ccording to the FDA, the abortion pill has not been studied in women who are heavy smokers," and that "[i]t is important to understand the need for two follow-up visits with your health care provider" after medication abortion. There is no medical benefit to providing patients with false, misleading, or irrelevant statements about abortion.

135.    Some of LDH's OAFLL regulations are incoherent. For example, the requirement that a physician remain on a clinic's premises "during the post-anesthesia recovery period until the patient is fully reacted and stable" makes no sense, as "reacted" is not a medical term. Moreover, there is no post-anesthesia recovery period for nearly all abortion patients, as medication abortion patients receive no anesthesia, and surgical abortion patients receive only analgesia or local anesthesia.

136.    Likewise, LDH's OAFLL requirement that abortion facilities have procedure rooms of at least 120 square feet has no medical benefit. Physical plant dimensions may be relevant as to the possible need for emergency egress, but there is no scientifically based minimum square footage necessary to perform an abortion procedure. And a medication abortion patient can be given pills in a room of any shape or size.

137.    LDH's myriad, detailed administrative and bureaucratic requirements for abortion facility directors, committees, and personnel, *supra* ¶ 93, are excessive and extravagant for outpatient facilities where one or two doctors work. Indeed, LDH does not impose these requirements on doctors' offices, unless the doctor is providing abortion care.

138.    For example, Hope's "quality assurance and performance improvement" team and governing body are needless formalities considering the clinic's small size. The individuals comprising these two bodies are clinic staff that interact and discuss clinic practices daily. Staff

time spent complying with LDH's governing body and "quality assurance and performance improvement" requirements, and creating records documenting that they have done so, provides no benefit to clinic operations or patient welfare.

139.    LDH's requirement that abortion providers report dozens of data points about every abortion to LDH within days of the procedure has no health basis, especially as LDH then takes years to make even a limited summary of just a small subset of this information available to the public on its website and fails to systematically make this information available to researchers at the Centers for Disease Control and Prevention for the purpose of writing annual abortion surveillance reports.

140.    Much of this information—including every patient's ultrasound image—must be included with the report, but has no utility for scientific research.

141.    Likewise, LDH's requirement that abortion facilities give it copies of every certification form executed by their patients—including patients who do not have an abortion—has no medical benefit.

142.    The examples of LDH's medically unnecessary OAFLL implementing regulations are not intended to be exhaustive as described herein, ¶¶ 120–141; there are many other examples that are not specifically discussed in this Complaint.

143.    There is no area of medicine other than abortion where LDH has seen fit to so onerously regulate an extremely safe medical practice and to interfere with the physician-patient relationship.

144.    In all other areas of extremely safe outpatient medicine, the details encompassed in LDH's abortion facility regulations are left to the exercise of the healthcare provider's professional judgment, cabined by generally applicable health facility laws, professional

regulations and self-governance, and tort liability. These limitations also apply in the provision of abortion care. Thus, LDH's additional requirements, imposed pursuant to OAFLL, provide no demonstrable added health benefit.

145. LDH's OAFLL regulatory scheme effectively prevents primary care physicians from offering abortion care to their patients, because of the very low number of patients required to invoke the onerous licensing requirements and heavy penalties—just five abortions per year, or just one in the second trimester—and because LDH regulations do not contain any exemption from requirements rationally applicable only to surgical abortion, such as the regulation of a procedure room for facilities that provide only medication abortion.

146. The failure to distinguish between providers that provide in-office medication abortion and abortion facilities providing surgical abortion has no medical basis and provides no health benefit.

147. Overall, LDH's regulations issued pursuant to OAFLL impose extensive and onerous requirements that are not medically necessary or appropriate. They subject Plaintiffs and their patients to unique, unjustified regulatory burdens that are not imposed upon any comparable healthcare providers and patients in Louisiana.

### iii. The Sham Health Statutes Provide No Medical Benefit

148. Similarly, the Sham Health Statutes, which are largely redundant with certain parts of LDH's OAFLL regulations but which apply to healthcare providers (or sometimes individuals) generally rather than specifically to licensed abortion facilities, do nothing to advance the provision of healthcare in Louisiana.

149. Among other things, the Sham Health Statutes improperly restrict who can provide abortion care in the state, depriving women of their choice of provider or type of specialist and unnecessarily narrowing the number and nature of physicians that an abortion facility like Hope

can employ.  Similarly to the provision in OAFLL's LDH regulations that only family physicians and ob/gyns may provide abortion care, the Sham Health Statutes forbid qualified physicians from providing abortions unless they are board-certified ob/gyns or family physicians and forbid all qualified, non-physician healthcare providers from performing abortions; they thus prohibit most healthcare providers with the requisite education and training to provide abortion services from doing so.  *See* La. Rev. Stat.  §§ 14:32.9, 32.9.1; La. Rev. Stat. § 40:1061.10(A)(1).

150.    Louisiana's singular treatment of abortion providers departs from mainstream medical practice.  The provision of healthcare, especially primary care by advance practice clinicians, has grown exponentially in the past two decades.  This reflects the increasing recognition afforded to the abilities of such healthcare providers, as well as the increasing specialization of physicians. The provision of healthcare by non-physicians also allows for cost control and the allocation of healthcare resources where they can be best utilized, and increases the choices available to patients.  Although advance practice clinicians can safely provide abortion care, and there is no statistically significant benefit, as measured by complication rates, failure rates, or any other outcome, in first trimester abortions performed by physicians as compared to advance practice clinicians, the Sham Health Statutes arbitrarily prohibit advance practice clinicians from providing abortion care.

151.    There is also no data indicating that board certification is associated with better abortion outcomes.  Professional standard-setting organizations do not support restricting abortion providers to board-certified specialists.  For example, ACOG opposes any requirement that physicians must be board-certified ob/gyns or family physicians to provide abortion care, because it "improperly regulate[s] medical care and do[es] not improve patient safety or quality of care."  For its part, LSBME has issued an Advisory Opinion stating that any physician who

has undergone any accredited residency and has "received training in the performance of surgical abortions or other gynecological surgery" is "deemed to have sufficient training" to perform first trimester surgical abortion.

152.    In fact, legal abortions in the United States can be, and are in other states, provided by healthcare providers with a variety of credentials, including specialist physicians, primary care physicians, certified nurse midwives, and nurse practitioners.  Medication and surgical abortion may safely be provided by a properly trained healthcare provider with any of these credentials. Limiting the type of healthcare professionals who may provide abortion care in Louisiana does nothing to advance or improve women's health and only limits the availability of abortion providers and women's access to abortion in the state.  As applied to qualified, trained professionals who are not board-certified ob/gyns or family physicians, this law has no medical benefit.

153.    Like OAFLL, the Sham Health Statutes require that a compulsory pre-abortion scripted ultrasound must be performed by either "the physician who performs the abortion" or the physician's "agent," who has documented proficiency in using an ultrasound machine.  *See* La. Rev. Stat. § 40:1061.10(D)(1).  This arbitrary requirement is medically unnecessary and offers no health benefit.  *See supra* ¶¶ 129–131.

154.    The Sham Health Statutes' restrictions on medication abortions also serve no health purpose and are designed only to make abortion more difficult to provide and for women to obtain.  The statute mandates that medication abortion be administered in a manner at odds with the protocol appearing on the FDA-approved label for Mifeprex.  *See* La. Rev. Stat. § 40:1061.11.  The statute imposes requirements, including that a physician must be present in the room when a patient is handed the medication, that are not on the Mifeprex label, and have no

35

scientific or medical basis for the protection of patient health.  As applied to medication abortion with Mifeprex, this law provides no medical benefit.

155.    The Sham Health Statutes endanger women's health by requiring patients to receive statements that are false, misleading, and contrary to best medical practices and standards.  The misnamed "Woman's Right to Know" law, La. Rev. Stat. § 40:1061.17(B), requires physicians to pass on to their patients certain statements in materials written by LDH, many of which are false, misleading, or irrelevant to them.  *See supra* ¶ 134.  As applied to those statements, this law provides no medical benefit.

156.    In addition to the misleading information they are forced to provide directly to their patients, abortion providers must also provide a link on their own websites to LDH's website, which contains similar statements.  *See* La. Rev. Stat. § 40:1061.17(C)(8).  As applied to the current LDH website, this law provides no medical benefit.

157.    La. Rev. Stat. §§ 40:1061.16(C)(4), 1061.17(G), 1061.19, and 10161.21 impose on physicians extensive and unnecessary requirements for maintaining charts and for reporting data to the State, identical to those imposed by LDH pursuant to OAFLL on abortion facilities, *see supra* ¶¶ 139–141.  For the same reasons, they provide no medical benefit.

## C.  Louisiana's Targeted Regulation Of Abortion Providers Substantially Obstructs Access To Abortion

158.    OAFLL and the Sham Health Statutes are enforced against the larger backdrop of an extraordinarily restrictive anti-abortion regime, even beyond the laws challenged here that directly apply to abortion providers.  Louisiana has numerous anti-abortion laws, including: a criminal ban on all abortions, punishing physicians with up to ten years' imprisonment "at hard labor" for performing them, to be enforced if *Roe v. Wade* is ever reversed, La. Rev. Stat. § 40:1061; a law excluding physicians from the State's malpractice reform provisions exclusively

when providing abortions, La. Rev. Stat. §9:2800.12(C)(2); a law prohibiting discrimination against individuals and hospitals for anti-abortion views, but not for pro-choice views, La. Rev. Stat. §§ 40:1299.31–32; and a law prohibiting any entity of State or local government from contracting with an abortion provider or with any individual or entity that contracts with an abortion provider, La. Rev. Stat. § 36:21(B)(1).

159.    Although those laws are not challenged here, OAFLL and the Sham Health Statutes impose far greater burdens on women than they otherwise might, due to the legal context in which LDH enforces them.

160.    For example, OAFLL, in theory, allows a physician practicing at an ambulatory surgical center or hospital to avoid LDH's burdensome regulations.  Therefore, some physicians ought to be able to provide abortion care in these facilities, to complement the care offered by licensed abortion facilities.  However, La. Rev. Stat. § 36: 21(B)(1) prevents this in practice.  Its prohibition against any contracts between any entity of State or local government and any entity that provides abortions prohibits a hospital or surgical center that provides abortions from, for example, accepting Medicaid or a state-run health insurance plan.  Given that virtually all hospitals and surgical centers take Medicaid and government health plans, virtually no hospitals or surgical centers can provide any meaningful amount of abortion care.  Therefore, OAFLL's effect on abortion access in Louisiana is much greater than a similar regulatory regime might have in a different state, where there are meaningful options for obtaining abortion care in hospitals or ambulatory surgical centers.

### i.    LDH's Enforcement Of OAFLL Makes Obtaining Abortion More Complex, Invasive, Confusing, Difficult, And Costly

161.    Pursuant to OAFLL, LDH has imposed numerous requirements on the provision of abortion care that make it more invasive, lengthier, and more confusing for patients.  LDH's

37

requirements force healthcare providers to forego the exercise of their professional judgment, and instead impose costly and invasive tests that may not be necessary or appropriate for an individual patient's circumstances.  For example, LDH requires three methods of verifying pregnancy, including unnecessary blood and/or urine tests, which make abortion more complex and invasive.  Physicians are also required to provide false, misleading, and irrelevant statements about abortion published by LDH and to provide medication abortion in a manner contrary to its label and scientific evidence.  These requirements all directly increase the burden on patients obtaining abortion.

162.    LDH's OAFLL requirements also increase facility administrative burdens, force clinics to redirect the time and attention of healthcare providers to activities other than providing healthcare, and require clinics to assume medically unnecessary expenses that are passed on to and harm patients by increasing procedure cost and decreasing access.

163.    For example, an ultrasound course required to obtain the type of documentation LDH requires for the mandatory pre-abortion ultrasound, costs approximately $500 and occupies an entire day of staff time.  These costs are then passed on to patients.

164.    Hope also employs several physicians to provide the State's mandatory scripted ultrasound 24 hours prior to any abortion procedure.  If this could be offered by physicians outside the clinic—such as a patient's own primary healthcare provider or another physician in her own community—the clinic would save a substantial amount of resources that are currently dedicated to employing these doctors.  This would impose substantially fewer burdens of travel, time, and cost on women, who could receive the State-mandated pre-abortion lecture and scripted ultrasound from providers of their choice in their communities and not have to go to the

clinic to receive the same from "the physician who is to perform the abortion" or his "agent" with documented proficiency in using an ultrasound machine.

165.    Likewise, LDH's unnecessary nursing requirements impose higher operating costs on licensed facilities.  Licensed nurses are paid at higher rates than, for instance, trained medical assistants.  Pursuant to LDH's nursing requirements, Hope has had to add nurses to its schedule to ensure the presence of a licensed nurse in each of two procedure rooms at all times when abortion procedures are performed.  Hiring and training of additional nursing staff has also absorbed staff time, as has maintaining documentation in nursing staff files that LDH requires. The additional costs of meeting the nursing requirement are passed on to patients.

166.    OAFLL regulations' myriad detailed requirements governing administrative and recordkeeping practices likewise increase cost.  For example, Hope's staff members and physicians dedicate substantial time to compliance with detailed reporting requirements, including obtaining data from patients, entering data into LDH's online database, redacting patient names and addresses, printing and reviewing forms, signing forms, and ensuring forms are placed in patient files.  This time must be compensated, and costs are passed on to the patients.

167.    Likewise, the time Hope's staff spends formally meeting as a "governing body" and as a "quality assurance and performance improvement" team and generating the required records for these meetings must be compensated and costs are passed on to the patients.

168.    In the absence of such requirements, Hope could potentially pass on cost savings to patients and could offer additional services, such as abortion care on days of the week now entirely devoted to the compulsory pre-abortion lecture and scripted ultrasounds.

169.    OAFLL regulations also transgress on the privacy of staff and patients.  They do not include any safeguards limiting the use of private, confidential, and/or personally identifying information obtained during surveys, nor against improper access to this information.

170.    Likewise, the regulations do not establish any procedures for preventing improper access to the private, confidential, sensitive, and/or personally-identifying information obtained from the reports facilities are obliged to make to LDH.  Although those reports do not contain the patient's names and addresses, they nevertheless contain sufficient information to identify individual women—for example, their age, race, marital status, municipality and parish of residence, and number of children.  They also contain sensitive information, such as images of the inside of women's bodies.

171.    Like LDH's OAFLL regulations themselves, LDH's inspections of abortion facilities pursuant to OAFLL are intrusive, unreasonable, burdensome, and ultimately reduce abortion access.

172.    LDH surveyors typically come to a licensed facility unannounced, review a clinic's written protocols, inspect the physical facility, equipment, and supplies, and interview most, if not all, the staff.  Every personnel file and patient file can be examined.  Surveyors spend time photocopying patient records, protocols, and other clinic documents.  Inspections typically last multiple days—in facilities roughly the size of an average new house.

173.    There is no limit to the number of inspections LDH may conduct.

174.    At the end of an inspection, the inspector typically notifies a clinic of any purported violation.  The clinic then receives a "statement of deficiency" in the mail and submits a corresponding "plan of correction," written directly on the statement of deficiency form, within ten days.  Developing and implementing the plan of correction also takes staff time and attention.

175.    LDH's inspections demand substantial effort and resources from Hope throughout the year, not just during and immediately after the inspections themselves.  LDH's onerous regulations and aggressive inspection and enforcement policies mean that Hope's binders of written policies, procedures, and documentation may be closely reviewed for compliance at any time and must be maintained in a constant state of readiness for inspection.  To do that, Hope must shift significant time and resources away from patient care to understanding, interpreting, and attempting to comply with these regulations.

176.    The regulatory scheme created and enforced by LDH under OAFLL is so burdensome and complex that it is extremely difficult for Hope and similar small medical practices to comply.  The number, nature, and complexity of the regulations and aggressive approach to inspection and enforcement subjects facilities, including Hope, to the constant risk of sanctions or loss of license.

177.    The still-greater burdens of the new-clinic licensing rule, which also applies to clinics that move to a new location or change hands burdens clinics' ability to move or to change ownership, in addition to limiting the ability of new clinics to open.

178.    By imposing inappropriate and voluminous regulatory requirements on small outpatient facilities, such as Hope, LDH virtually ensures that minor clerical oversights will occur, for which sanctions are allowed even absent a risk to patient health and safety.

179.    LDH has repeatedly issued statements of deficiencies to licensed abortion facilities, including Hope, without any medical or legal basis for doing so.  For example, LDH has issued statements of deficiencies alleging that Hope has:

   a.    violated "requirements" that do not appear in LDH's regulations;

   b.    failed to adhere to "recommendations" that do not appear in LDH's regulations; and,

    c.  "threatened" patient health and safety by following medical practices that are well within the standard of care and not been found to be unsafe in earlier inspections.

180.    LDH's position that it has the discretion to suspend or revoke a clinic's license for any alleged violations of any laws, rules, or regulations, including its own, without regard to whether the violation presents any risk to patient health or safety, has also reduced access.

181.    For example, in September 2010, LDH suspended Hope's license without prior notice on the basis of alleged violations of LDH's regulations regarding the administration of sedation. LDH did so even though the allegations regarding sedation had been made by an LDH surveyor nearly a month before the suspension, during the course of an inspection, and even though Hope had amended its sedation protocol immediately, with the surveyor still present.  The surveyor's own notes identify the time of the so-called "immediate jeopardy" as 9:20 a.m. and acknowledge that it was "removed at 10:35 am," just over an hour later.  Hope amended the protocol on the spot in order to accommodate LDH's concern, even though the protocol was long-standing and had been disclosed to numerous LDH surveyors, without objection or concern, during prior inspections.

182.    Nearly a month after the inspection, LDH then exercised its authority to immediately strip Hope of its license, based on the sedation protocol as allegedly violative of "any" federal, state, or local law, rule, or regulation.  At 5:00 p.m. the Friday before Labor Day, on September 3, 2010, LDH simultaneously issued a press release stating that it had suspended and revoked Hope's license and sent a fax to Hope stating that its license had been suspended effective immediately and a revocation hearing had been set for the following month.

183.    As a result of LDH's suspension and revocation of its license, Hope was forced to close for three weeks and to engage in years of litigation that eventually culminated in a settlement agreement lifting the suspension and revocation.

184.    LDH's aggressive enforcement and abuse of technical requirements continued in 2011 when, in another particularly egregious notice of violation, LDH alleged that Hope had not satisfied its requirement to "develop[] disaster plans for both internal and external occurrences" and to hold and document "annual drills" in accordance with the plan, even though Hope had provided LDH surveyors with both its "fire drill, tornado and bomb threat policy" and documentation of its annual evacuation drills.  LDH alleged, without offering a reason, that even though Hope had a policy for fires, tornados and bombs, the clinic lacked a "disaster plan," and further, that Hope's documented annual "evacuation drills" were insufficient to satisfy the requirement to hold and document drills.  LDH even retroactively relied on these allegations regarding the supposed inadequacy of the "disaster" plan to support its 2010 decision to revoke Hope's license.

185.    LDH's aggressive enforcement tactics of the requirements imposed pursuant to OAFLL have forced other clinics to close permanently.  Since LDH first issued regulations pursuant to OAFLL in 2003, it has suspended or revoked the operating licenses of several outpatient abortion facilities.

186.    Upon information and belief, in July 2012, LDH revoked the license of Midtown Medical, LLC, a licensed abortion facility in New Orleans, on the basis of allegations made in the course of an unannounced, warrantless survey pursuant to OAFLL that had occurred nearly two months prior, stating that any corrective actions taken during or subsequent to the inspection would have no bearing on its irrevocable decision.

43

187.    Similarly, upon information and belief, the license of Gentilly Medical Clinic for

Women, a licensed abortion facility in New Orleans, was revoked by LDH in January 2010,

because it lacked a site-specific license from the United States Drug Enforcement Administration

("DEA"), as required by LDH's regulations issued under OAFLL, even though LDH was aware

that the facility did not prescribe any narcotic medication for which such a license would actually

be required by the DEA.

188.    The burdens of either complying with LDH's legally and medically unnecessary demands

or contesting the deficiency statements through a lengthy and expensive legal process has forced

outpatient abortion clinics to close.

189.    Upon information and belief, Bossier City Medical Suite ("Bossier"), a licensed

outpatient abortion facility in Bossier City, closed in April 2017 after LDH sought to impose

costly requirements regarding how Bossier kept and maintained medical records.

190.    Causeway Medical Clinic ("Causeway"), a licensed outpatient abortion facility in

Metairie, closed in February 2016 after an unconstitutional requirement that its physicians obtain

admitting privileges at a nearby hospital briefly became enforceable by LDH against Causeway's

primary physician.

191.    As a result of LDH's application of OAFLL, the number of licensed abortion providers

has fallen precipitously in the state in recent years.  Currently, the number of licensed abortion

facilities in Louisiana has dropped to three, from eleven in 2000, the last full year before OAFLL

was passed, and seven as recently as 2011.

          ii.    **The Sham Health Statutes Impose Similar Heavy Burdens And
                 Obstacles To Access**

192.    Like LDH's regulatory scheme, the Sham Health Statutes impose heavy burdens on

Louisiana's women, and for largely the same reasons.  The Sham Health Statutes impose onerous

and costly requirements on abortion providers that are difficult to meet and are not necessary for the safe provision of abortion services. The costs of complying with these statutes are passed on to and harm patients in the form of decreased numbers of providers and increases in cost.

193.    The Sham Health Statutes' restrictions on who can provide abortion care unnecessarily limit the number and kind of healthcare providers who can provide abortions, including a complete ban on advance practice clinicians. This reduces patient choice and the total number of available providers, and additional costs associated with hiring doctors with required credentials—over other qualified practitioners—are passed on to patients.

194.    Likewise, the Sham Health Statutes' restriction on medication abortion unnecessarily requires additional physician appointments, increasing the duration, complexity, and cost of receiving medication abortion.

195.    The Sham Health Statutes' restrictions on who may perform the required, state-mandated pre-abortion scripted ultrasound lecture likewise limit women's options to obtain these services from their regular healthcare providers in their communities.

196.    The Sham Health Statutes' requirements that healthcare providers pass on to their patients false, misleading, or irrelevant statements about abortion confuse and disturb patients and increase the burden of counseling.

197.    To comply with the Sham Health Statutes' informed consent requirements—as with the analogous requirement instituted by LDH pursuant to OAFLL—Hope employs physicians to provide the State-mandated patient lecturing and scripted ultrasound twenty-four hours prior to any abortion procedure. If this could be offered by physicians outside the clinic, in communities where patients reside, the clinic would save resources that it could focus on the medical aspects of abortion provision, and women could save on travel costs and time burdens.

198.    The Sham Health Statutes impose on physicians extensive and unnecessary requirements for maintaining charts and for reporting data to the State, identical to those imposed by LDH pursuant to OAFLL on abortion facilities, which tax clinic staff time and resources, the costs of which are passed on to patients.

199.    By imposing significant costs on Hope, the Sham Health Statutes increase the expense of abortion for Hope's patients.

200.    Likewise, by imposing significant burdens on clinics, as measured not only in cost, but also in staff time and attention to compliance and to fighting LDH, the Sham Health Statutes have contributed, in conjunction with LDH's administration of OAFLL, to the closure of most of the State's licensed outpatient abortion facilities.

### iii.    The Reduced Number Of Abortion Providers Caused By Louisiana's Targeted Regulation Of Abortion Providers Further Burdens Women

201.    Given the barriers to operating an abortion facility imposed by LDH's OAFLL regulations and Sham Health Statutes, discussed *supra* ¶¶ 161–200, most of Louisiana's abortion facilities have closed since OAFLL was enacted, and no new abortion facilities have opened in Louisiana in years.  As discussed *supra* ¶¶ 68-70, 78-84, LDH has also manipulated the licensing process so as to delay and frustrate the opening of new clinics.

202.    Hope, in Shreveport, is the sole abortion clinic remaining in the northern part of the state. Louisiana's two other abortion clinics are in the southeastern part of the state (Baton Rouge and New Orleans), leaving central, northeastern, and southwestern Louisiana without a single abortion provider.

203.    The dwindling number of abortion providers in the state makes access to abortion extremely difficult.  In fact, Louisiana ranks among the lowest in the entire country in terms of access, with about 312,000 women per clinic, when evaluating the ratio of the remaining

abortion clinics in the state to the population of women of reproductive age (935,000 women and 3 clinics). This ratio is on par with Texas's at its worst, when nearly half of that state's clinics closed after the unconstitutional House Bill 2 was enacted—318,000 women per clinic.

204.    As with any healthcare service with limited availability, the lack of providers of abortion care in Louisiana erects barriers to access that can delay or even prevent women from obtaining care. Limited abortion access has resulted in significant burdens for women, including clinic congestion, delays in obtaining abortion care, increased travel distances, extra time spent in transit, and out-of-pocket financial costs beyond the cost of the abortion, including lost wages resulting from missing time off work, overnight and travel expenses, and childcare expenses.

205.    About three-quarters of Louisiana women live in parishes with no abortion provider. These women cannot access abortion services in their community, and they cannot obtain the service from their regular primary care provider, if they have one. These women must travel outside of their communities, sometimes long distances, in order to access abortion services. Forcing women to travel outside of their communities does nothing to protect or advance women's health, and only imposes additional risks and burdens on the ability to obtain care.

206.    According to the most recent LDH statistics available, from 2014, approximately 10,000 women obtained abortions in Louisiana annually. Women seek abortions for a variety of reasons, psychological, emotional, medical, familial, social, and economic. These include rape, pregnancies that threaten their lives or health, financial hardship, and concern for the number and spacing of their children, among other reasons.

207.    Louisiana is one of the poorest states in the nation, with the nation's third-highest levels of overall and child poverty. Women in Louisiana are much more likely than men to be poor— more than half of Louisianans living below the federal poverty line are women, including nearly

a quarter of a million women of child-bearing age.  These women often do not earn enough to cover their monthly expenses and often do not have enough at the end of each month to buy food and pay their bills.

208.    Women seeking abortion are disproportionately poor: approximately 49 percent of women having abortions in the United States in 2014 subsisted below the federal poverty line.  Another 26 percent are low-income, with incomes at 100 to 199 percent of the poverty level.

209.    Many women, particularly low-income women, are delayed in obtaining care where travel is required due to logistical and financial hurdles.  Even relatively short distances—30 to 50 miles, for example—can present significant challenges for low-income women who must find or save for a ride to the clinic, travel expenses, childcare, and time off work.

210.    The elevated cost of abortion itself delays or prevents many women from accessing care because of the need to find or save sufficient funds.  Because the cost of the procedure increases with gestational age, the more a woman is delayed, the more expensive the procedure becomes.  For these women, any increase in the cost of abortion can make the difference in obtaining an abortion and being forced to carry to term.

211.    Very few women in Louisiana have insurance that covers abortion services.  Health insurance purchased through the state exchange is not allowed to cover abortion.  Public funds may not be used to pay for abortion except when a woman's life is in danger or when she has reported being a victim of rape or incest both to law enforcement and to a physician who has certified the report.  Thus, the majority of women must pay for abortion services out-of-pocket.

212.    The limited options for providers, the need to travel for care, and the increased costs of medical care from providers operating under onerous regulatory restrictions together result in delays for women in obtaining abortion care.

48

213.    The burdens associated with travel to the few remaining abortion providers in the state arise in a number of ways:

   a.    Due to the requirement that a woman's first visit to a clinic see "the physician" who will provide the abortion or the physician's "agent," women who do not reside nearby one of the state's three remaining abortion providers must travel to the facility twice or arrange for overnight lodging at their own expense;

   b.    Many women must take time off from work and arrange for childcare while traveling to seek abortion care, which imposes additional costs and logistical hurdles—for many women in low-wage jobs, a two-day absence from work could jeopardize their employment status;

   c.    Women living with domestic violence will have to explain increased absence from home and risk further violence.

214.    LDH's regulations and enforcement practices do not just limit women's access to abortion.  They also have harmed the health of women in Louisiana more generally, by causing some healthcare providers, especially ob/gyns, to leave the state in search of a less arbitrary and stigmatizing regulatory environment.  By creating a hostile and unwelcoming regulatory environment for providers of women's reproductive care, LDH's implementation and enforcement of OAFLL has decreased access to reproductive healthcare generally.

215.    In addition, delay in accessing abortion increases anxiety and suffering for many women, regardless of economic status.  It forces women to continue to endure the physical and psychological burdens of pregnancy despite their desire to terminate the pregnancy.

216.    Because abortion complication rates increase with gestational age, and because of the risks inherent in remaining pregnant for a longer time, delays in obtaining an abortion are

49

associated with increased risk of complications for the patient. In addition, the complexity and the duration of the procedure, and consequently its costs, begin to increase after a certain point in gestational age—eleven weeks from the patient's last menstrual period at Hope.

217.    There are certain points in pregnancy at which the procedure may become more complex or fewer options may be available.  If a woman is delayed past the cutoff gestational date point at which medication abortion is available—currently, ten weeks gestation according to Mifeprex's label, although some clinics, such as Hope, use a slightly earlier date—she will be unable to obtain her desired method of abortion and will be required to have a surgical abortion.  And a patient seeking surgical abortion may be delayed into having a procedure at a later date, at a higher cost, and with a higher, albeit still low, risk of complication.

218.    Lack of access to abortion causes more women to carry unwanted pregnancies to term, which carries its own health risks that are far greater than those of abortion.

219.    Furthermore, by reducing access to abortion through its regulation and enforcement strategies, LDH has increased the risk that women will seek out and obtain abortion illegally and risk death or serious illness.

## FIRST CLAIM FOR RELIEF

### (Substantive Due Process – Rights To Liberty And Privacy)

220.    The allegations of paragraphs 1 through 219 are incorporated as though fully set forth herein.

221.    OAFLL and the Sham Health Statutes, as applied and enforced by LDH through its implementing regulations and enforcement practices, violate Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States

Constitution, because they impose an undue burden on women's right to choose abortion before viability.

222.    By imposing medically unnecessary, burdensome regulations on outpatient abortion facilities and their providers, and drastically limiting the ability of healthcare providers other than at outpatient abortion facilities to provide abortion services, OAFLL and the Sham Health Statutes (i) increase the complexity, invasiveness, and duration of abortion; (ii) reduce the number and availability of abortion providers in the state, thereby decreasing Plaintiffs' patients' access to abortion services; and (iii) have increased costs for outpatient abortion facilities, which must in turn be passed on to Plaintiffs' patients, further reducing their access.

223.    By failing to establish safeguards against the disclosure of confidential, private, sensitive, and personally identifying information, including information gathered during warrantless inspections and from mandatory reports on each abortion patient, OAFLL and the Sham Health Statutes threaten the right to privacy of abortion facilities' staff and patients.

## SECOND CLAIM FOR RELIEF

### (Procedural Due Process – Rights To Liberty And Property)

224.    The allegations of paragraphs 1 through 219 are incorporated as though fully set forth herein.

225.    Hope has a constitutionally protected property interest in its outpatient abortion facility license.  LDH nonetheless fails to give prior notice before taking action against a clinic's license and does not provide an opportunity to be heard before a neutral decision-maker before taking such action.

226.    OAFLL, on its face and as applied and enforced by LDH through its implementing regulations and enforcement practices, deprives Plaintiffs of liberty and property interests in an arbitrary, unreasonable, and capricious manner, and invests an impermissible degree of

51

subjective discretion in the Secretary by authorizing the Secretary to suspend or revoke an outpatient abortion facility's license based on any violation of any federal,  state, or local law or regulation; authorizing the Secretary to ban an individual for life from owning, managing, directing, or operating an outpatient abortion facility; and sharply curtailing the scope of judicial review of the Secretary's actions.

## THIRD CLAIM FOR RELIEF

### (Fourth Amendment – Protection Against Unreasonable Searches)

227.    The allegations of paragraphs 1 through 219 are incorporated as though fully set forth herein.

228.    By inflicting warrantless, lengthy, and intrusive inspections on abortion facilities, in the absence of probable cause to believe that any violation has occurred, and without giving the clinic an opportunity for pre-compliance review before a neutral decision-maker, OAFLL, on its face and as applied by LDH, violates Plaintiffs' and their patients' Fourth Amendment right to be free from unreasonable searches.

## ATTORNEY'S FEES

229.    Plaintiffs are entitled to an award of reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

1.    Issue a declaratory judgment that:

   a.    La. Rev. Stat. §§ 40:2175.1–2175.6 and the term "outpatient abortion facility" in La. Rev. Stat. § 40:2199(A)(1) are unconstitutional, as applied and enforced by LDH through its implementing regulations and enforcement practices;

52

b. La. Rev. Stat. §§ 40:2175.1–2175.6 and the term "outpatient abortion facility" in La. Rev. Stat. § 40:2199(A)(1) are unconstitutional and unenforceable to the extent they permit LDH to engage in unreasonable searches of licensed abortion facilities;

c. La. Rev. Stat. §§ 40:2175.1–2175.6 and the term "outpatient abortion facility" in La. Rev. Stat. § 40:2199(A)(1) are unconstitutional and unenforceable to the extent they deprive licensed abortion facilities of their property interests in their licenses without due process of law; and

d. La. Rev. Stat. §§ 14:32.9, 32.9.1 and La. Rev. Stat. §§ 40:1061.10(A)(1), 1061.10(D)(1), 1061.11, 1061.16(B), 1061.16(C), 1061.17(B), 1061.17(C)(8), 1061.17(G), 1061.19, and 1061.21, are unconstitutional, as applied and enforced by Defendants through their implementing regulations and enforcement practices.

2. Issue permanent injunctive relief, without bond, restraining Defendants, and their employees, agents, and successors in office from:

a. enforcing La. Rev. Stat. §§ 40:2175.1–2175.6 and the term "outpatient abortion facility" in La. Rev. Stat. § 40:2199(A)(1) through regulations and practices that impose an undue burden on people seeking abortion in Louisiana;

b. depriving licensed abortion facilities of their protected property interests in their licenses without due process of law;

c. engaging in unreasonable searches of facilities licensed pursuant to La. Rev. Stat. §§ 40:2175.1–2175.6 and the term "outpatient abortion facility" in La. Rev. Stat. § 40:2199(A)(1); and

53

d.   enforcing La. Rev. Stat. §§ 14:32.9, 32.9.1; La. Rev. Stat. §§ 40:1061.10(A)(1), 1061.10(D)(1), 1061.11, 1061.16(B), 1061.16(C), 1061.17(B), 1061.17(C)(8), 1061.17(G), 1061.19, and 1061.21 in a manner that imposes an undue burden on people seeking abortion in Louisiana;

3.   Grant Plaintiffs' reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable laws and rules; and

4.   Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated:  June 27, 2017

Respectfully submitted,

/s/ Larry Samuel_____
Charles M. (Larry) Samuel III
RITTENBERG, SAMUEL & PHILLIPS, LLC
715 Girod Street, Suite 100
New Orleans, LA 70130
Office: (504) 524-5555 x 17
Cell: (504) 715-0484
Fax: (504) 524-0912
Email: samuel@rittenbergsamuel.com

David Brown*
Jenny Ma*
Caroline Sacerdote*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, New York 10038
Phone: (917) 637-3600
Fax: (917) 637-3666
Email: dbrown@reprorights.org

Shannon Rose Selden*
DEBEVOISE & PLIMPTON LLP
919 Third Ave
New York, New York 10022
Phone: (212) 909-6000
Fax: (212) 909-6836
Email: srselden@debevoise.com

*Motions for Admission *Pro Hac Vice* filed herewith

*ATTORNEYS FOR PLAINTIFFS*