# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

JUNE MEDICAL SERVICES, LLC d/b/a HOPE
MEDICAL GROUP FOR WOMEN, on behalf of its
patients, physicians, and staff; and DR. JOHN DOE
1 and DR. JOHN DOE 3, on behalf of themselves
and their patients,

        Plaintiffs,

  v.

REBEKAH GEE, in her official capacity as
Secretary of the Louisiana Department of Health;
and JAMES E. STEWART, SR., in his official
capacity as District Attorney for Caddo Parish,

        Defendants.

Case No. 17-00404-BAJ-RLB

## <u>AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

JURISDICTION AND VENUE ......................................................................................... 5

PARTIES ............................................................................................................................ 6

    I.     Plaintiffs............................................................................................................. 6

    II.    Defendants ......................................................................................................... 7

FACTUAL ALLEGATIONS ............................................................................................. 7

    I.     Abortion Is An Extremely Safe And Essential Component Of Basic Healthcare ............. 7

          A.    Methods Of Providing Abortion Care................................................... 8

          B.    Legal Abortion Is An Inherently Safe Procedure, No Matter The Method .......... 9

          C.    Incremental Regulation Of Abortion Is Unnecessary And Harmful To Women's Health .......................................................................................... 10

    II.    Louisiana Has A Long And Consistent History Of Trying To Prevent Women From Accessing Abortion ................................................................. 12

    III.   The Challenged Laws And Regulations Unconstitutionally Burden Access To Abortion ................................................................................................. 16

          A.    Each Of OAFLL, The OAFLL Regulations, And The Sham Health Statutes Imposes An Unconstitutional Burden On Access To Abortion ............. 17

                1.    Licensing Requirements ................................................................ 23

                2.    Plant, Administrative, and Recordkeeping Requirements ..................... 25

                3.    Provider Restrictions ..................................................................... 31

                4.    Redundant Or Unnecessary Testing And Interference With Care .......... 34

                5.    Provision Of False, Misleading, Or Irrelevant Information................... 38

                6.    Invasive And Disruptive Survey And Inspection Practices And Penalties ..................................................................................... 39

          B.    Each Of The Challenged Laws and Regulations Restricts Abortion Access To The Detriment Of Women's Health .................................................. 46

          C.    Singling Out Abortion For Burdensome And Unnecessary Regulation Serves No Medical Purpose ................................................................. 51

FIRST CLAIM FOR RELIEF ......................................................................................... 53

SECOND CLAIM FOR RELIEF ..................................................................................... 53

THIRD CLAIM FOR RELIEF ......................................................................................... 55

FOURTH CLAIM FOR RELIEF ..................................................................................... 57

FIFTH CLAIM FOR RELIEF .......................................................................................... 58

ATTORNEY'S FEES ....................................................................................................... 58

REQUEST FOR RELIEF ................................................................................................. 58

Plaintiffs June Medical Services, LLC (d/b/a/ Hope Medical Group for Women) ("Hope"), on behalf of its patients, physicians, and staff; and Dr. John Doe 1 and Dr. John Doe 3,[1] on behalf of themselves and their patients (together with Hope, "Plaintiffs"), by and through their undersigned attorneys, bring this Amended Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

## PRELIMINARY STATEMENT

1.      Louisiana's Outpatient Abortion Facility Licensing Law, thirteen of its implementing regulations, and twelve provisions of Louisiana's criminal code and public health laws are unconstitutional.

2.      Together, these laws and regulations create a nearly insurmountable series of medically unjustified barriers to abortion in the State of Louisiana.  Individually, each of these twenty-six hurdles has had the purpose and effect of placing substantial obstacles in the way of women seeking abortions and radically limiting access to safe and legal abortion to the detriment of women's health.

3.      Each one of the challenged laws and regulations—directly and in context— singles out abortion, the healthcare workers who provide abortion, and the women who seek to exercise their constitutionally protected decision to have an abortion, and subjects them to onerous and ostracizing legal requirements that are inconsistent with acceptable medical standards.  These twenty-six laws do not protect women's health.  These twenty-six laws were not intended to protect women's health.  These twenty-six laws were intended for one purpose

---

[1] To avoid confusion, the physician Plaintiffs here adopt the same John Doe numbering system as in other, ongoing litigation in this district, in which Louisiana abortion providers have been numbered John Doe 1 through 6.  *See June Med. Servs. v. Gee*, No. 3:14-CV-525- JWD-RLB; *June Med. Servs. v. Gee*, No. 3:16-CV-444-BAJ-RLB. Plaintiff physicians adopt the pseudonym "John Doe" regardless of gender.

only: to make abortion so incredibly difficult to provide in Louisiana that it is not accessible to the women who live there.  In that, these laws, and the Defendants who enforce them, have nearly succeeded.

4.      Plaintiff Hope is one of just three remaining outpatient abortion clinics in Louisiana.  It is one of very few medical facilities left in the state where women can exercise their constitutionally protected right to terminate a pregnancy.  Since the challenged laws were enacted and implemented, over three-quarters of Louisiana's licensed abortion facilities have shut down.  Louisiana is home to nearly a million women of reproductive age; the overwhelming majority now live in parishes without a local provider and cannot obtain this basic, safe, reproductive healthcare in their own community.

5.      Plaintiffs challenge each of the following laws and regulations because each impedes Plaintiffs' ability to provide safe, effective medical care and each operates, directly and in context, to meaningfully restrict access to abortion in Louisiana to the detriment of women's health:

      i.   the Outpatient Abortion Facility Licensing Law, La. Rev. Stat. §§ 40:2175.1–2175.6 and the term "outpatient abortion facility" in La. Rev. Stat. § 40:2199(A)(1) (collectively, "OAFLL"), a licensing statute that singles out medical facilities providing abortion care from all other healthcare providers of comparable outpatient care in Louisiana by requiring these clinics to obtain a facility license from the Louisiana Department of Health ("LDH")[2];

---

[2] Until recently, LDH was named the Department of Health and Hospitals.  To avoid confusion, Plaintiffs use the current name and acronym throughout.

ii.  the thirteen specified "OAFLL Regulations," *see* La. Admin. Code tit. 48, §§ 4401, 4403, 4407, 4411, 4417, 4423, 4425, 4431, 4433, 4435(C), 4437(A)(4)–(5), 4437(B)(1), and 4445, established and enforced by LDH, pursuant to OAFLL, that require outpatient clinics providing abortion to satisfy a tortuous series of medically unnecessary requirements for obtaining and keeping such a license that subjects them to more burdensome regulations than healthcare providers who perform office-based procedures that have a similar or greater risk of complications; and

iii. twelve "Sham Health Statutes" from Louisiana's criminal code (Title 14) and public health laws (Title 40) that unnecessarily restrict who can provide abortions; dictate how they provide care; require the provision of false, misleading, or irrelevant information to be provided with care; and require onerous recordkeeping—all of which are largely duplicative of requirements already found in the licensing regulations.

6.     These twenty-six laws and regulations, on their face and as implemented by Defendants, isolate outpatient abortion facilities and providers of abortion care and force them to comply with extensive and unnecessarily burdensome regulations in virtually every aspect of patient care and business operations.  These requirements far exceed the regulations imposed on medical practitioners who provide comparable, or even higher-risk, outpatient procedures, and the accepted standards of care for physicians' offices and outpatient surgical procedures.  They provide no medical benefit.  Defendants have targeted abortion providers with these laws and regulations in order to force them to close, not to improve their quality of care.

7.     Legal abortion is extremely safe.  It is a basic component of comprehensive reproductive healthcare.  It has exceedingly low complication rates and can be—and is—safely and routinely provided on an outpatient basis by doctors, nurses, and other healthcare professionals.  There is no medical basis for singling out abortion and isolating it behind a thicket of specialized laws.  In the absence of these laws, the doctors, nurses, and medical professionals who could provide abortion care would still be subject to Louisiana's generally applicable professional licensure, health, and tort laws and regulations; the clinics, hospitals, and physicians' offices where they provide care would continue to be regulated and supervised by the State and professional organizations.  Abortion would still be subject to regulation and supervision, but no more so than any other medically similar procedure.

8.     Subjecting abortion to uniquely burdensome legal and regulatory requirements harms women.  When the state limits access to abortion, it reduces the availability of care; limits the options for care; impairs providers' ability to offer individualized, patient-centric care; increases clinic risks; and leads to potentially worse medical outcomes.  The costs are economic as well as personal; limited access drives up the costs of abortion care, travel, childcare, and time off work, among other things.  It also means care is delayed—and delay threatens physical risks and economic costs of its own.  These burdens are exacerbated by the poverty that many women in Louisiana face daily and unfold in a state that consistently has one of the highest maternal and infant mortality rates in the nation.

9.     These are risks that women in Louisiana should not have to bear.  The United States Constitution protects individual women against these state-imposed risks and against the state's unwarranted intrusion on their individual reproductive choices prior to viability.  Women have a constitutional right "to choose to have an abortion and to obtain it without undue

influence from the state." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992).

That right to determine when, whether, and how to have children is a personal one, with public

consequences: "[t]he ability of women to participate equally in the economic and social life of

the Nation has been facilitated by their ability to control their reproductive lives." *Id.* at 856.

When state laws impose burdens on abortion access that outweigh any benefits they confer, they

violate the protections guaranteed by the Fourteenth Amendment. *See Whole Woman's Health v.*

*Hellerstedt*, 136 S. Ct. 2292, 2309–10 (2016). Each of these twenty-six laws fails that test and

should be permanently enjoined.

10. Plaintiffs Hope and two of its physicians bring this suit on their own behalf and

on behalf of their patients. They bring this suit because women have a constitutional right to

abortion prior to viability and cannot exercise that right in Louisiana without overcoming the

substantial obstacles these laws have erected in their path. Plaintiffs bring this suit because

isolating abortion and barricading it behind a nearly insurmountable obstacle course of laws and

regulations does nothing to make abortion any safer; it simply makes a constitutionally protected

medical procedure difficult—if not impossible—for women to obtain.

11. On their own behalf and on behalf of their patients, Plaintiffs bring this 42 U.S.C.

§ 1983 action under the Fourth and Fourteenth Amendments to the United States Constitution to

seek declaratory and injunctive relief from the unconstitutional requirements imposed by these

laws.

## JURISDICTION AND VENUE

12. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3).

13. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C.

§§ 2201 and 2202; Rules 57 and 65 of the Federal Rules of Civil Procedure; and the general legal

and equitable powers of this Court.

14.     Venue is appropriate under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district, and Defendant Gee, who is sued in her official capacity, carries out her official duties at offices located in this district.

## PARTIES

### I.     Plaintiffs

15.     Plaintiff Hope is a women's reproductive health clinic located in Shreveport. Hope is one of only three remaining licensed outpatient abortion facilities in the state of Louisiana, and has been providing reproductive healthcare, including abortion care, since 1980. Hope is a member of the National Abortion Federation ("NAF") and is licensed and inspected by LDH.  In addition to providing abortion care, Hope provides pregnancy testing and counseling, contraception, education, as well as referrals for prenatal care, treatment of sexually transmitted infections, and adoption.  Hope sues on its own behalf and on behalf of its patients, physicians, and staff.

16.     Plaintiff Dr. John Doe 1 is a board-certified physician in family medicine and addiction medicine.  Dr. Doe 1 has over a decade of experience as a physician and is one of two clinic physicians who regularly provide abortion care for patients at Hope.  Dr. Doe 1 sues on his own behalf and on behalf of his patients.

17.     Plaintiff Dr. John Doe 3 is a board-certified obstetrician-gynecologist ("ob/gyn"). Dr. Doe 3 has over forty years of experience as a physician and is one of two clinic physicians who regularly provide abortion care for patients at Hope.  Dr. Doe 3 sues on his own behalf and on behalf of his patients.

18.     Drs. John Doe 1 and 3 sue using pseudonyms to prevent public disclosure of their identities, which would expose them to a substantial risk of harassment, intimidation, and violence by those opposed to the lawful provision of abortion services.

## II.    Defendants

19.    Defendant Rebekah Gee is the Secretary of LDH ("Secretary") and is sued in her official capacity.  LDH has the authority to issue and enforce OAFLL and the OAFLL Regulations, and to revoke, suspend, or deny an outpatient abortion facility's license for violation of this or any law.  La. Rev. Stat. § 40:2175.6.  LDH is the part of the executive branch of the State of Louisiana that is responsible for "the development and providing of health and medical services for the prevention of disease for the citizens of Louisiana," through its offices and officers.  La. Rev. Stat. §§ 36:4, 36:251.  LDH thus has broad discretion to implement and enforce OAFLL, the OAFLL Regulations, and the Sham Health Statutes.

20.    LDH violates its obligation to protect and provide for the health and safety of the women of Louisiana by enacting regulations pursuant to OAFLL that harm women's health, and by enforcing the OAFLL Regulations and Sham Health Statutes in a manner that serves no legitimate health interest and unduly burdens the provision of abortion care in Louisiana.

21.    Defendant James E. Stewart, Sr. is the District Attorney of Caddo Parish, in which Hope is located, and is sued in his official capacity.  Mr. Stewart has the authority to enforce OAFLL and the OAFLL Regulations, to which criminal penalties apply under La. Rev. Stat. § 40:2199(A)(2), and the Sham Health Statutes, both La. Rev. Stat. §§ 14:32.9 and 14:32.9.1, which are part of the criminal code, and the challenged portions of La. Rev. Stat. §§  40:1061.10–1061.21, to which criminal penalties apply under La. Rev. Stat. § 40:1061.29.

## FACTUAL ALLEGATIONS

## I.    Abortion Is An Extremely Safe And Essential Component Of Basic Healthcare

22.    Legal abortion is a common and vital component of basic healthcare.  Nearly one in four women in the United States will obtain an abortion by age forty-five.

A.      **Methods Of Providing Abortion Care**

23.     There are generally two methods of performing an abortion: by oral ingestion of medication or by procedure.

24.     Medication abortion typically involves the ingestion by mouth of two medications—mifepristone (brand name Mifeprex) and misoprostol (brand name Cytotec)—a day or two apart.  In a typical medication abortion, the patient ingests the first medication at the facility and self-administers the second medication outside the facility twenty-four to forty-eight hours later.  The pregnancy is passed outside the facility, in a process similar to miscarriage.

25.     Abortion by procedure typically involves the use of gentle suction passed through the vaginal canal to empty the uterus ("aspiration abortion").  Aspiration abortion is a minimally invasive, straightforward, and brief procedure—typically taking about five minutes.  It is almost always performed in an outpatient setting and is currently the most common abortion method regardless of gestational age.  Other names for this procedure include suction curettage and dilation and curettage.

26.     An aspiration abortion does not require any incision or general anesthesia.  An analgesic such as ibuprofen, an anxiolytic such as Valium, a local anesthetic, and/or minimal sedation may be used during or prior to the procedure.  The absence of incision and the introduction of instruments through a body cavity also means that aspiration abortion is a clean, non-sterile procedure that does not need to be performed in an operating room.

27.     After about the fifteenth week, depending on the provider and the patient, additional instruments may be used as the primary method of removal, a procedure that can be referred to as dilation and evacuation ("D&E").

**B.     Legal Abortion Is An Inherently Safe Procedure, No Matter The Method**

28.     Legal abortion is an extremely safe medical procedure with very low risk of complications.  Leading medical authorities, including the American College of Obstetricians and Gynecologists ("ACOG"), the American Medical Association, the American Academy of Family Physicians, the American Academy of Pediatrics, and the American Osteopathic Association have all concluded that abortion is one of the safest procedures in contemporary medical practice.

29.     In a recent comprehensive report on the safety and quality of abortion care, the National Academies of Science, Engineering, and Medicine—nongovernmental entities established by Congress and by charter to provide independent, objective analysis and advice to address the nation's complex scientific problems and public policies—concluded that aspiration and medication abortions "rarely result in complications" and at rates "no more than a fraction of a percent."

30.     In one of the most comprehensive studies to date, published in *Obstetrics & Gynecology*, the medical journal of ACOG, researchers found that major complications (defined as requiring hospital admission, surgery, or blood transfusion) from abortions by any method at a clinic or doctor's office or other legally recognized facility occurred in less than one-quarter of one percent (0.23 percent) of cases.

31.     By contrast, vasectomy, another minor procedure frequently performed in a physician's office, has a prevalence of complications of two percent, more than double that of abortion, and a prevalence of major complications requiring hospitalization of 0.2 to 0.8 percent, up to five times higher than abortion.

32.     Medication abortion is also safer than commonly used medications such as aspirin, acetaminophen (Tylenol), and sildenafil (Viagra).

### C.    Incremental Regulation Of Abortion Is Unnecessary And Harmful To Women's Health

33.    Specialized regulations targeting abortion do not make women safer.

34.    In states that do not require that abortion be performed in a highly regulated environment, complication rates do not materially differ between abortions performed in a regulated environment, such as hospitals, and significantly less regulated environments, such as doctor's offices.

35.    Abortion is much safer than numerous other in-office medical procedures performed by ob/gyns in Louisiana.  For example, abortion is comparable to or lower in risk and less complex than tubal ligation; endometrial ablation (removing the lining of the uterus); cone biopsy (surgical removal of abnormal tissue from the cervix); removal of pre-cancerous cells on the cervix through a Loop Electrosurgical Excision Procedure; hysteroscopy (scoping of the cervix and uterus); and colposcopy (scoping of the cervix and vaginal walls).  All of these procedures are performed in office-based, outpatient settings subject to less regulation than abortion clinics.

36.    Abortion is far safer than continuing a pregnancy to term, especially in Louisiana—which has one of the worst maternal health outcome rates in the country.  Nationally, a woman in the United States is nearly 14 times more likely to die in childbirth than from a legal abortion.  Based on data collected from the state, maternal deaths in Louisiana ranged from 13.4 to 88.9 maternal deaths per 100,000 live births.  A statistically significant racial disparity exists: Black women are 1.8 to 3.4 times more likely to die of a pregnancy-associated or pregnancy-related cause than are white Louisianans.  By comparison, according to the Centers for Disease Control ("CDC"), there were 0.62 deaths per 100,000 legal abortions, a fatality rate of 0.0006%.

37.    A woman who does not receive an abortion and instead remains pregnant faces substantial health risks in carrying pregnancy to term.  According to the CDC, 144 in 10,000 women who gave birth in a hospital in the United States in 2014 experienced unexpected outcomes of labor and delivery that resulted in significant short- or long-term consequences.  In its own informational pamphlet, LDH warns that pregnancy carries a risk of death by emboli, eclampsia, hemorrhage, sepsis, cerebral vascular accidents, and anesthesia-related deaths. *Women's Right to Know*, Pregnancy Risks, http://ldh.la.gov/index.cfm/page/1038 (last visited June 11, 2018).  LDH has also identified the possible risks of vaginal or caesarean birth to include: injury to the bowel, bladder, or rectum; heavy bleeding (hemorrhaging); infection; blood transfusion; hysterectomy; emergency treatment; and "rarely, death."  *Id*.  The State acknowledges that "Louisiana's consistently low health ranking and persistent racial disparities indicate the need for consistent assessments of women's health before and during their pregnancies."

38.    Women face meaningful risks during pregnancy and childbirth that they do not face during or after an abortion.  Pregnancy and childbirth carry significant risks, including those listed by Louisiana in its own required informational pamphlet.  According to that pamphlet, one in ten women develop infections as a result of delivery, one in twenty women suffer excessive blood loss as a result of delivery, and delivery can lead to injuries to the bladder, bowel, or rectum; hemorrhaging; infertility; and death.  Almost half of deliveries, including caesarian deliveries, are associated with at least one medical complication.

39.    The rates of maternal health risks and mortality, moreover, increase for women who are poor, of color, and/or lack access to care—the very women most likely to be impeded in their efforts to have an abortion.

40.     Nonetheless, of all the reproductive healthcare that women in Louisiana might seek on an outpatient basis, LDH singles out abortion care and subjects it to a comprehensive and calculated scheme of burdensome regulations.  The requirements LDH imposes on abortion clinics' provision of care through the OAFLL Regulations are not medically necessary.  These laws and regulations do not confer any tangible health benefits beyond those already available through generally applicable health-professional licensure laws, regulations of physicians' offices, and tort laws that govern these other, equally or more risky, reproductive healthcare needs.

## II.     Louisiana Has A Long And Consistent History Of Trying To Prevent Women From Accessing Abortion

41.     Louisiana's efforts to isolate and eradicate legal abortion go back over a century.  Louisiana first declared abortion a crime in 1855.

42.     Prior to *Roe v. Wade*, 410 U.S. 113 (1973), Louisiana was among a small minority of states that prohibited all abortions almost without exception.  *See* La. Rev. Stat. § 14:87 (1964).

43.     In the 1950s and 1960s, despite the development of antibiotics and improvements in prenatal care, a surge in the number of American women seeking illegal abortion created a public health crisis of increasing maternal mortality rates.  But Louisiana refused to alter its laws.  While many states responded to the increase in maternal deaths by allowing abortion in a broader set of circumstances and regulating it as any other form of medical care—as many physicians demanded—Louisiana was one of the very few states to refuse any accommodation for women's health.  Instead, Louisiana retained its criminal ban on abortion almost without exception.

44.     Louisiana's ban on legal abortion forced many women in the state to forego abortion entirely or to obtain it illegally at great personal risk.  Many women who were forced to turn to illegal methods died as a result.

45.     It was only after *Roe*—and litigation forcing Louisiana to follow *Roe*—that Louisiana's criminal abortion ban, La. Rev. Stat. § 14:87, was struck down as unconstitutional and enjoined from enforcement.  *See Weeks v. Connick*, Nos. 73-469, 74-2425, 74-3197 (E.D. La. 1976); *Rosen v. La. State Bd. of Med. Examiners*, 380 F. Supp. 875 (E.D. La. 1974).

46.     Ever since *Roe*, the State has consistently and zealously singled abortion out from other comparably safe—and even riskier—medical interventions, passing laws and imposing regulations that impose medically unsupported restrictions.

47.     In addition to the laws challenged in this Amended Complaint and detailed below, Louisiana's long history of hostility to abortion includes a criminal ban on all abortions, punishing physicians with up to ten years' imprisonment "at hard labor" for performing them, to be enforced if *Roe* is ever reversed, La Rev. Stat. § 40:1061; a law excluding physicians from Louisiana's malpractice reform provisions exclusively when providing abortions, La. Rev. Stat. §§ 40:1299.31–39A, 40:1299.41(K); and a law prohibiting discrimination against individuals for anti-abortion views, but not for pro-choice views, La. Rev. Stat. § 40:1061.2.

48.     These other targeted regulations have the effect of causing the laws and regulations that are challenged here—OAFLL, the OAFLL Regulations, and the Sham Health Statutes—to impose far greater burdens on women than they otherwise might.  For example, La. Rev. Stat. § 36:21(B)(1) prohibits any contracts between any entity of state or local government and any entity that provides abortion care.  This prohibition on its face bars a hospital or Ambulatory Surgery Center ("ASC") that accepts Medicaid or contracts for a state-run health

insurance plan—which is true of virtually all hospitals and ASCs—from providing abortion care.[3]  As a result, although OAFLL, in theory, allows a physician to provide abortion care at an ASC or hospital and thereby avoid LDH's abortion facility-specific regulations, Section 21(B)(1) acts together with OAFLL and its regulations to ensure that ASCs and hospitals do not provide abortion care.

49.    Most recently on May 23, 2018, Louisiana adopted one of the most restrictive anti-abortion laws in the country—a plainly unconstitutional law purporting to ban abortion after fifteen weeks, S.B. 181, Reg. Sess. (La. 2018), to be effective if Mississippi's nearly identical ban is upheld.

50.    The burden of the targeted laws and regulations are compounded by LDH's implementation.  LDH subjects outpatient abortion facilities to an unpredictable and constantly shifting regulatory environment through the arbitrary and burdensome way in which LDH frequently issues and rescinds regulations.  Since OAFLL was passed, LDH has adopted dozens of "emergency" regulations.  It has rescinded many of these, after allowing them to take effect for a period of time.  Conversely, it has allowed others to lapse, thus permitting the earlier regulations to take effect for a period of time, only to then re-enact them once again.  *See, e.g.*, 38 La. Reg. 2457 (Oct. 20, 2012) (2012 emergency regulations); 39 La. Reg. 1234 (May 20, 2013) (re-enacting 2012 emergency regulations); 9 La. Reg. 18 (Jan. 20, 2013) (same); 38 La. Reg. 1961 (Aug. 20, 2012) (2012 emergency "facility need review" regulation); 39 La. Reg.

---

[3] Act 498 modifies La. Rev. Stat. § 36:21 to instead prohibit LDH from entering a "provider agreement for medical assistance program funding" with a healthcare entity that (a) performs abortion in Louisiana; (b) provides its own facilities where reimbursable medical assistance program services are performed for use to perform abortions in Louisiana; (c) hires or retains a healthcare entity for the purpose of performing abortions in Louisiana; (d) or provides reimbursable medical assistance program services in the same physical facility as a licensed outpatient abortion facility.  *See* 2018 La. Sess. Law Serv. Act 498 (H.B. 891) (effective thirty days after the date upon which federal regulation authorizes Louisiana to "condition funding provided through medical assistance program provider agreements to a recipient on the basis of the provider's status as an abortion provider").

2982–3002 (2013 emergency regulations); 39 La. Reg. 3361 (Dec. 20, 2013) (noting intent to permanently adopt 2013 emergency regulations); 40 La. Reg. 203 (Feb. 20, 2014) (rescinding 2013 emergency regulations); 40 La. Reg. 2262 (Dec. 20, 2014) (noting intent to permanently adopt regulations substantially similar to 2013 emergency regulations); 41 La. Reg. 1238 (July 20, 2015) (2015 emergency regulations); 42 La. Reg. 2139–41 (Dec. 20, 2016) (2016 emergency regulations); 43 La. Reg. 502 (Mar. 20, 2017) (renewing some of the 2016 emergency regulations); 43 La. Reg. 872 (May 20, 2017) (reinstating by emergency rulemaking some of the 2016 emergency regulations that had previously lapsed by operation of law).  Due to the unpredictable regulatory environment created by LDH's inconsistent rulemaking, licensed abortion facilities exist in a state of constant uncertainty that makes planning difficult, dissuades and frustrates potential abortion facility licensees from opening new licensed facilities, and incentivizes existing licensees to give up and return their licenses.

  51. The State's constant attack on abortion is not motivated by concern for women's health.  It is designed and intended to regulate abortion out of existence by systematically impeding both women and medical providers—in stark contrast to all other comparable medical procedures—through a mounting series of laws and regulations.  Proponents of the State's abortion regulations have repeatedly made their purpose clear:

> i. Rep. Frank Hoffmann, the author of many of the laws challenged here, has stated on several occasions, "We've been named the top pro-life state in America . . . and we do it through making it tough to get an abortion in Louisiana."
>
> ii. Regarding the fifteen-week abortion ban, Senator John Milkovich stated, "The abortionists are relentless in their assault against the unborn . . . . We intend to

fight three times harder and end the scourge of abortion in Louisiana.  It is my

hope this legislation will assist in this fight."

    iii.  State Representative Katrina Jackson has stated, "I look forward . . . to the day

abortion is not legal in this country."

    iv.  Former Governor Bobby Jindal has said that "Abortions are not health care,

and this is not about the patient. The patient in this case is that unborn baby;"

and that "We hope that this war on women and the unborn will someday end

. . . . Until that day comes, we will fight against the abortion industry with

every tool at our disposal under the Constitution, secure in the knowledge that

our cause is just."

52.    These comments reflect the policy of the State of Louisiana that no woman should

ever be allowed to access abortion, except to prevent her death, and that any physician who

provides an abortion should be imprisoned.  This includes women who suffer rape, incest, a

lethal fetal anomaly, or a serious health problem that does not risk her death.  *See* La. Rev. Stat.

§ 40:1061.

53.    The twenty-six challenged laws and regulations are simply one chapter in

Louisiana's long history of trying to eradicate legal abortion through legislation and regulation,

without regard to the individual rights, decisions, and health of Louisiana women.  The

challenged laws and regulations are squarely within this long state tradition of erecting every

possible barrier to abortion, regardless of its cost to women.

## III.  The Challenged Laws And Regulations Unconstitutionally Burden Access To Abortion

54.    The twenty-six challenged laws and regulations are intended, designed,

implemented, and enforced to make abortion substantially more difficult to provide and obtain

16

than comparably safe medical interventions.  Each of these laws and regulations singles out abortion from other similar medical interventions and subjects it to unique restrictions, including how the care can be performed, who can provide it, and where it can provided.

55.    These requirements are not supported by medical or scientific evidence, do nothing to make abortion care safer, and in fact undermine women's health by limiting and delaying access to care, and therefore serve only to place substantial obstacles in the path of women who seek abortions.

56.    The laws have achieved that goal.  The number of abortion clinics operating in Louisiana has dropped by over seventy-five percent as a result of these laws.  Today, only three abortion clinics serve the nearly million women of reproductive age who live there.

### A.    Each Of OAFLL, The OAFLL Regulations, And The Sham Health Statutes Imposes An Unconstitutional Burden On Access To Abortion

57.    OAFLL, La. Rev. Stat. §§ 40:2175.1–2175.6 and § 40:2199(A)(1) (defining "outpatient abortion facility"), singles out outpatient clinics providing abortion care from all other healthcare providers of comparable outpatient care in Louisiana by subjecting these clinics to the burdensome requirement of obtaining and annually renewing a facility license from LDH.

58.    Plaintiffs challenge OAFLL on its face and as applied through certain OAFLL implementing regulations in La. Admin. Code tit. 48, §§ 4401, 4403, 4407, 4411, 4417, 4423, 4425, 4431, 4433, 4435(C), 4437(A)(4)–(5), 4437(B)(1), and 4445 (the "OAFLL Regulations").

59.    Plaintiffs also challenge each of the OAFLL Regulations individually on its face and as applied.  The challenged OAFLL Regulations are as follows:

a.    **La. Admin. Code tit. 48, §§ 4401, 4403, and 4411**, *the licensing regulations*, impose licensing and annual licensing renewal requirements on facilities that provide a single second-trimester or at least five first-trimester abortions, preventing clinicians from

providing their patients abortion care in their office unless they submit to onerous requirements.  This licensure requirement mandates that facilities comply with unconstitutional laws as a condition to obtaining and retaining a license and is therefore inseparable from the other requirements to be challenged.  License renewal requires submitting another application, additional documents, and a fee.

b.  **La. Admin. Code tit. 48, § 440**7, *the state-mandated inspection and patient record access requirement*, subjects outpatient abortion facilities to survey activities that require them to provide unfettered access to any and all documents—including patient medical records.  It authorizes LDH to revoke or immediately suspend a license for deficiencies, regardless of whether there is a medical basis for doing so.

c.  **La. Admin. Code tit. 48, § 4417**, *the suspension without notice requirement*, allows LDH to immediately suspend the license of an outpatient abortion facility based on violations of law or regulation.

d.  **La. Admin. Code tit. 48, § 4423**, *medical and non-medical staffing regulations*, imposes requirements that prohibit otherwise qualified clinicians from providing care, thereby narrowing the number and type of providers that an outpatient abortion facility can employ, and micro-manages without medical benefit the tasks the required medical director, administrator, and head of nursing must undertake.

e.  **La. Admin. Code tit. 48, § 4425**, *state-mandated access to confidential records*, imposes burdensome and medically unnecessary requirements for the contents of medical records for all patients—including certification of receipt of state-mandated false and misleading information—and record retention policies for patient medical records that are costly and time-intensive.  It further mandates that outpatient abortion facilities maintain

documentation of compliance with all reporting requirements—which include sending the State a copy of each patient's ultrasound image.  These records—which go back for years—must be made available to the State during its inspections.

f.  **La. Admin. Code tit. 48, § 4431**, *redundant testing and mandatory misinformation*, requires that multiple methods be used to verify a pregnancy in contravention of the standard of care and requires patients to undergo a vaginal examination before receiving abortion care, whether or not it is recommended by the provider.  It similarly requires laboratory tests that are not necessary for all patients.  It imposes a pre-abortion lecture and scripted ultrasound, requiring also that it must be performed by "the physician who performs the abortion" or an individual who is the physician's agent and who has documented proficiency in providing an ultrasound.  Patients must certify that they have received state-mandated misinformation, and outpatient abortion facilities must comply with extensive reporting requirements.

g.  **La. Admin. Code tit. 48, § 4433**, *the arbitrary provider regulation*, limits without a medical basis who may provide medication abortion and requires prescribing physicians to be in the same room and in the physical presence of the patient.  It also imposes detailed documentation and reporting requirements.

h.  **La. Admin. Code tit. 48, § 4435(C)**, *medically unnecessary staffing*, contains an unnecessary mandate that a licensed nurse be in each procedure room at all times when an abortion is performed where assistants would be qualified to perform such monitoring.

i.  **La. Admin. Code tit. 48, § 4437(A)(4)–(5)**, *medically unnecessary post-operative care*, mandates specific post-operative care and procedures, including, for example, medically unnecessary requirements that the physician performing the abortion inspect the products

19

of conception and document results of the assessment; each of these requirements could safely be performed by a trained medical professional instead.

j. **La. Admin. Code tit. 48, § 4437(B)(1)**, *24-7 medical record access*, requires patients to be given the phone number of the physician performing the abortion or healthcare personnel employed by the physician, or the facility, who has twenty-four hour access to the woman's medical records, a requirement not imposed on similarly safe healthcare procedures or providers.

k. **La. Admin. Code tit. 48, § 4445**, *physical plant restrictions*, contains numerous unnecessary physical environment requirements with a level of specificity that has no medical benefit and is unique to its regulation of outpatient abortion facilities.  In addition to specifying, for instance, the kind of sink faucets a facility must provide at all hand washing lavatories/stations, it includes specifications for signage; procedure rooms; post-anesthesia recovery areas; equipment and supply storage areas; and, if applicable, in-house laundry.

60.    Plaintiffs challenge the following statutes (referred to herein as the "Sham Health Statutes") facially and as-applied through LDH's enforcement practices:

a. **La. Rev. Stat. § 14:32.9** forbids qualified, non-physician healthcare providers, such as trained nurse midwives, from providing any abortion care;

b. **La. Rev. Stat. § 14:32.9.1** forbids qualified, non-physician healthcare providers, such as trained nurse midwives, from providing medication abortion care;

c. **La. Rev. Stat. § 40:1061.10(A)(1)** forbids qualified physicians, such as trained surgeons or adolescent pediatricians, as well as qualified, non-physician healthcare providers, such as trained nurse midwives, from providing abortion care;

20

d.  **La. Rev. Stat. § 40:1061.10(D)(1)** forbids a physician who is not "the physician performing the abortion" from performing the State's mandated, pre-abortion scripted ultrasound, unless he or she is the "physician's agent" and has "documented evidence that he or she has completed a course in the operation of ultrasound equipment," although such documentation is not typically given in medical school or residency;

e.  **La. Rev. Stat. § 40:1061.11** forbids physicians from offering medication abortion in a medically appropriate manner, including a requirement to be "in the same room and in the physical presence of the pregnant woman when the drug . . . is initially . . . provided to the pregnant woman," and a requirement to report all "serious adverse events" to the State and to the Federal Food and Drug Administration ("FDA"), even though these requirements are inconsistent with the label for Mifeprex, the only FDA-approved drug for inducing abortion;[4]

f.  **La. Rev. Stat. § 40:1061.16(B)–(C)** requires abortion providers to give their patients materials published by LDH containing false, misleading, or irrelevant statements regarding the supposed psychological impact of abortion; to obtain certifications from their patients that they have received those materials; and to keep copies of those certifications in their patients' medical records for at least seven years;

g.  **La. Rev. Stat. § 40:1061.17(B)** requires abortion providers to pass on to their patients numerous false, misleading, or irrelevant statements regarding abortion, and to give their patients materials published by LDH containing false, misleading, or irrelevant

---

[4] This statute also imposes numerous requirements on medication abortion that are redundant with statutes applicable to abortion generally, serving solely to increase applicable penalties and compliance burdens on physicians who provide medication abortion.

statements regarding abortion, such as a thoroughly discredited connection with breast cancer;

h. **La. Rev. Stat. § 40:1061.17(C)(8)** requires abortion providers to link to their websites an LDH website containing numerous false, misleading, or irrelevant statements about abortion, such as a thoroughly discredited connection with breast cancer;

i. **La. Rev. Stat. § 40:1061.17(G)** requires abortion providers to certify that they have given their patients LDH's published materials containing numerous false, misleading, or irrelevant statements about abortion;

j. **La. Rev. Stat. § 40:1061.19** requires abortion providers to keep copies of this certification, every other signed, state-mandated consent form and certification, and the state-mandated abortion report, in each abortion patient's medical record for at least seven years; and

k. **La. Rev. Stat. § 40:1061.21** requires abortion providers to report twenty-five data points to LDH regarding each abortion patient, plus copies of every certification and state-mandated consent form signed by the patient, plus an image of the patient's ultrasound, plus an additional report if the patient experiences a complication, all within thirty days of the patient's abortion.  LDH then takes years to make a summary of a limited subset of the submitted data available to the public on its website.

61.    Each of OAFLL, the OAFLL Regulations, and the Sham Health Statutes individually, and in the context of existing law, creates an undue burden on the right to obtain a legal abortion by, among other things: (a) imposing a costly and burdensome licensing requirement on abortion facilities; (b) requiring unnecessary physical plant, recordkeeping, and staffing requirements; (c) unnecessarily restricting *who* can provide abortion care, thereby

depriving women of the choice of qualified healthcare providers; (d) unnecessarily restricting *how* abortion care may be provided, thereby increasing the costs, intrusiveness, and difficulty of obtaining an abortion; (e) requiring that abortion providers subject women to lengthy false, misleading, or unnecessary information, which serves only to create confusion for the patient; and (f) subjecting abortion clinics to unnecessary survey and inspection practices that take time and attention away from patient care and subject abortion providers to drastic penalties for even minor violations.

### 1. Licensing Requirements

62.    OAFLL states that "[a]n outpatient abortion facility may not be established or operated in this state without an appropriate license." **La. Rev. Stat. § 40:2175.4(A)**.  The statute, *see* **La. Rev. Stat. § 40:2175.6(A)–(H)**, along with LDH's implementing regulations and enforcement practices, creates a complex licensing application process for both initial licensing and renewals.  *See, e.g.,* **La. Rev. Stat. § 40:2175.6(A)–(H); La. Admin. Code tit. 48, §§ 4405, 4411.**

63.    Under OAFLL, an outpatient abortion facility must first submit an application that requires eight different documents, plans, and specifications for approval by LDH, and "any other documentation or information required by the department for licensure," along with a licensing fee of $600.  As specified in **La. Admin. Code tit. 48, § 4405**, these documents include:

   a.   a completed outpatient abortion facility initial licensing application and the non-refundable initial licensing fee;

   b.   a copy of the approval letter of the architectural facility plans for the outpatient abortion facility by the Office of State Fire Marshal;

c.  a copy of the Office of State Fire Marshal's on-site inspection report with approval for occupancy;

d.  a copy of the health inspection report from LDH's Office of Public Health;

e.  an organizational chart identifying the name, position, and title of each person composing the governing body and key administrative personnel;

f.  a floor sketch or drawing of the premises to be licensed;

g.  "pursuant to R.S. 40:2116, a copy of the facility need review approval letter;" and

h.  any other documentation or information required by LDH for licensure, including but not limited to, a copy of any waiver approval letter, if applicable.  *Id.*

64.    After the facility submits its complete initial licensing application, it must then pass an on-site inspection and will be granted a license only if LDH finds that the facility "meets the requirements established under [the statute] and the licensing standards adopted in pursuance thereof."  **La. Rev. Stat. § 40:2175.6(C)**.

65.    The Secretary may deny a license if the facility "is in violation of any provision" of OAFLL, of LDH's OAFLL regulations, or "of any other federal or state law or regulation." **La. Rev. Stat. § 40:2175.6(G)**.

66.    **La. Rev. Stat. § 40:2175.6(D)** requires that each outpatient abortion facility renew its license annually.  To do so, the facility must submit another application and $600 fee. It must also submit a copy of the most current on-site inspection report with approval for occupancy from the Office of the State Fire Marshal and a copy of the most recent health inspection report from the Office of the State Fire Marshal along with any other documentation required by LDH.  Further, LDH may conduct another on-site inspection upon receipt of application for renewal.  *Id.*  Renewal will be only granted if LDH again finds that the facility

24

"meet[s] the requirements established under [the statute] and the licensing standards adopted in pursuance thereof." *Id.*

67.    Once a facility is licensed, the Secretary may immediately suspend its license if an inspection by LDH determines that the facility "is in violation of any provision" of OAFLL, of LDH's OAFLL regulations, or "of any other federal or state law or regulation" and the Secretary determines that the violation poses "an imminent or immediate threat to the health, welfare, or safety of a client or patient." **La. Rev. Stat. § 40:2175.6(H)**.

68.    LDH's enforcement of OAFLL has made it virtually impossible for most outpatient abortion facility licensees to keep their doors open in Louisiana.  Seventy-five percent of the clinics in the state have shut down; just three, including Plaintiff Hope, are left.  Louisiana is now as close as it has ever been since *Roe* to outlawing abortion in practice, with the State having effectively banned most healthcare facilities from providing abortion, other than in a few narrow circumstances.

### 2.    Plant, Administrative, and Recordkeeping Requirements

69.    **La. Admin. Code tit. 48, § 4445** and **La. Rev. Stat. § 40:2175.6** require providers of abortion care to meet excessively detailed physical plant, administrative, and recordkeeping requirements that do nothing to further the provision of safe and appropriate medical care, but make abortion more burdensome to provide and more difficult to obtain.

### (A)    Plant Requirements

70.    The physical plant requirements imposed on abortion clinics pursuant to **La. Admin. Code tit. 48, § 4445** are enumerated in detail and so narrowly defined as to make compliance costly and laborious.  Unlike physician's offices, including ob/gyn offices where office-based surgery is performed, but are subject to much more general physical plant

requirements, abortion clinics must adhere to a lengthy laundry list of detailed criteria—none of which meaningfully contributes to the quality of care.

71.    For example, **La. Admin. Code tit. 48, § 4445(A)(5)(b)** requires the outpatient abortion facility to have "hot and cold water delivered through a mixing faucet" and to provide "mechanical hand drying devices and/or disposable paper towels" at hand washing stations.  **La. Admin. Code tit. 48, § 4445(E)** requires the outpatient abortion facility to have a "soiled utility room" that contains a "utility sink, a work counter, a hand washing station, [and] waste receptacle(s)," among other things.  **Section 4445(A)(6)** requires, among other things, some of the facility's wall finishes to be "free of fissures, open joints, or crevices that may retain or permit the passage of dirt particles."  Because OAFLL permits a clinic's license to be revoked upon violation of any regulation, LDH could deny or revoke a license if a restroom were temporarily out of paper towels, or if there were no garbage can in a "soiled utility room."

72.    **La. Admin. Code tit. 48, § 4445(C)** requires abortion procedures to be performed in a segregated procedure room with a "minimum clear floor area of 120 square feet" and requires that each procedure room and post-anesthesia recovery area be equipped with a hand-washing station.  **La. Admin. Code tit. 48, § 4455(D)** requires a post-anesthesia recovery area with a minimum clearance of two feet, six inches around three sides of a stretcher, and requires a nurse's station equipped with "a countertop, space for supplies, provisions for charting, and a communication system" which "shall be arranged to provide for direct visual observation of all traffic into the recovery area."

73.    There is no scientifically based minimum square footage necessary to perform or recover from an abortion procedure, and these regulations prevent Hope from using its space in a way that best accommodates its patients.  There is also no medical or scientific basis for

requiring that a nurse's station be placed in a specific area or have any particular characteristics. Notably, physicians governed by the office-based surgery regulations—applicable to physicians' offices where certain types of surgical procedures are performed, *see* La. Admin. Code tit. 46, §§ 7301, *et seq.*—are not subject to any minimum square footage or nursing station requirements.

74.    These needlessly specific requirements—inapplicable to physician's offices— make it more costly to open and operate abortion facilities, without materially improving the delivery of care.

### (B)    Administrative Requirements

75.    **La. Admin. Code tit. 48, § 4423** reaches into the clinic's staffing and governance—requiring that it be run by an administrator who is required to be on site at all times (or that responsibilities are covered by a backup), have a physician medical director, and a licensed nurse.  These regulations specify not only what positions a clinic must fill, but the work to be done by the professionals hired into those jobs.  They set out—with specificity—what the medical director, nurse, and administrator each much do.  A significant portion of that work is paperwork, not patient care.

76.    Extensive requirements for written policies and procedures are cumbersome, often overlapping or contradictory, and frequently unclear as to whether they must be developed and implemented by the clinic administrator, the medical staff, or the nursing staff.  *See, e.g.*, **La. Admin. Code tit. 48 §§ 4423(B)(3)**, **(D)(2)**.  Because the clinic's written policies, procedures, and documentation are subject to inspection and close compliance review with these onerous and unclear requirements at any time, Hope must shift significant time and resources away from patient care to understanding, interpreting, and attempting to comply with regulations.

77.    LDH's myriad, detailed administrative and bureaucratic requirements for abortion facilities are excessive for medical facilities where one or two doctors work and provide no health benefits.  The requirements increase administrative burdens, force clinics to redirect the time and attention of healthcare providers to activities other than providing healthcare, and require clinics to assume medically unnecessary expenses that are passed on to and harm patients by increasing procedure cost and decreasing access.  Staff spend time complying with these regulations and creating records documenting that they have done so, which increases costs for clinic operations that are passed on to patients.

### (C)    Recordkeeping Requirements

78.    Three of the challenged statutes and one of the challenged regulations, **La. Rev. Stat. §§ 40:1061.11, 40:1061.19, 40:1061.21,** and **La. Admin Code tit. 48, § 4425** require Hope and other providers of abortion care to devote substantial time and effort to collecting and maintaining records that have nothing to do with their patients or their care, and are required solely to impose burdens on access to care and to ensure the State may access and review these intimate files.

79.    Under OAFLL, the State dictates specific information that must be collected and recorded from patients.  All patient medical records must contain fifty-four enumerated data points, including patient identification data, medical history, ultrasounds, and records concerning procedures that may or may not be applicable to a particular patient (i.e., an "anesthesia report" and an "operative report"—even though, for example, at Hope, abortion patients do not receive general anesthesia or have an operation).  *See* **La. Admin. Code tit. 48, § 4425(C)**.

80.    Neither ambulatory surgical centers nor physicians subject to office-based surgery regulations are required to include specific data on their charts.

81.     Those records must be stored for seven years (ten years for minors), and at least one year's worth of records must be kept on site at the facility.  *See* **La. Admin. Code tit. 48, § 4425(B)**.

82.     Those records, which include private and extremely personal medical information, including names, addresses, age, race, marital status, medical history, and pictures of the insides of women's bodies, are subject to review by employees and agents of LDH at any time during the survey and inspection process.  *See* **La. Admin. Code tit. 48, §§ 4425(A)–(C), 4407(B)(1)**.  If the requested records are maintained off-site, and LDH requests them, Hope must retrieve them no later than twenty-four hours from the request and bear all associated costs.  *See* **La. Admin. Code tit. 48, § 4425(B)**.

83.     Detailed recordkeeping requirements needlessly increase costs for abortion providers.  For example, Hope's staff members and physicians dedicate substantial time to compliance with detailed recordkeeping and reporting requirements in Section 4425, including obtaining data from patients, entering data into LDH's online database, redacting patient names and addresses, printing and reviewing forms, signing forms, and ensuring forms are placed in patient files.  *See* **La. Admin. Code tit. 48, § 4425**.

84.     At Hope, this can take ten to twenty hours of staff time each week, time that must be compensated and adds to costs that are passed on to patients.  This is also time taken away from patient care.

85.     Moreover, storing vast quantities of records and medically unnecessary consent forms and certifications required by OAFLL is burdensome; records take up space at the clinic and off-site storage is costly, and those costs are passed along to patients.  Differing storage requirements for adults and minors, set forth in **La. Admin. Code tit. 48, § 4425(B)**, create

burdens; at Hope, for example, staff must go through an annual labor-intensive process of manually separating adult patient files that are past seven years from minor patient files, such that records of minors may be maintained for another three years.

86.    Facilities must report twenty-five separate data points from the patient file to LDH within thirty days of a patient's abortion; this data includes copies of every certification and state-mandated consent form, an image of the patient's ultrasound, and a complication report should the patient experience one.

87.    The regulations mandate disclosure of personal medical records to state agents during inspections but do nothing to protect patient privacy; they also do nothing to prevent improper access to the private, confidential, sensitive, and/or personally identifying information obtained from the reports facilities are obliged to make to LDH.  The state-mandated reports contain sufficient information to identify individual women patients, including their age, race, marital status, municipality and parish of residence, and number of children.  The state-mandated records also contain sensitive information, such as images of the inside of women's bodies and any notes made by clinic staff about the patient's healthcare decisions, and must be made available for governmental review.

88.    These reporting requirements have no medical or scientific basis.  LDH purports to require this information to promote health and welfare, but in fact LDH takes years to make a summary of a limited subset of the submitted data available to the public on its website. Moreover, ob/gyns and family physician offices have no similar reporting requirement; for example, there is no requirement that ultrasound images of pregnant patients *not* seeking an abortion be provided to the state.

### 3.    Provider Restrictions

89.    Three of the Sham Health Statutes and several of the OAFLL Regulations unnecessarily limit who can provide care to patients seeking an abortion in ways that have no medical basis and prevent the efficient delivery of quality healthcare.  These six laws and regulations do nothing to advance women's health, are contrary to medical guidance, and serve only to impose barriers to abortion that can delay or even prevent women from obtaining care. *See* **La. Rev. Stat. §§ 14:32.9, 14:32.9.1, 40:1061.10(A)(1); La. Admin Code. tit 48. §§ 4423, 4431, 4433.**

90.    By limiting the provision of abortion care to a small subset of the healthcare providers who would otherwise be qualified to provide it, these six laws and regulations impose an undue burden.  Limited abortion access has resulted in significant burdens for women, including clinic congestion, delays in obtaining abortion care, increased travel distances, extra time spent in transit, and out-of-pocket financial costs beyond the cost of the abortion, including lost wages resulting from missing work, overnight and travel expenses, and childcare expenses.

91.    Specifically, **La. Rev. Stat. §§ 14:32.9**, **14:32.9.1**, and **40:1061.10(A)(1)** prohibit qualified physicians, such as trained surgeons or adolescent pediatricians, as well as qualified, non-physician healthcare providers, such as trained nurse midwives, from providing abortion care; **La. Admin. Code tit. 48, § 4423(C)** prohibits anyone but a physician who is currently enrolled in or has completed a residency rotation in ob/gyn or family medicine from providing abortion care; and **La. Admin. Code tit. 48, § 4433** limits the provision of medication abortion to these same providers.

92.    The provision of healthcare, especially primary care by advance practice clinicians, has grown exponentially in the past two decades.  This reflects the increasing recognition afforded to the abilities of such healthcare providers, as well as the increasing

31

specialization of physicians.  The provision of healthcare by non-physicians also allows for cost control and the allocation of healthcare resources where they can be best utilized, and increases the choices available to patients.  As measured by complication rates, failure rates, or any other outcome, advance practice clinicians provide first-trimester abortion care just as safely as physicians.

93.    There is no data indicating that required board certification is associated with better abortion outcomes.  Professional standard-setting organizations do not support restricting abortion providers to board-certified specialists, as the State does in **La. Rev. Stat. §§ 14:32.9, 14:32.9.1, 40:1061.10(A)(1)**.  For example, ACOG opposes any requirement that physicians must be board-certified ob/gyns or family physicians to provide abortion care, because it "improperly regulate[s] medical care and do[es] not improve patient safety or quality of care." For its part, the Louisiana State Board of Medical Examiners ("LSBME") has issued an Advisory Opinion stating that any physician who has undergone any accredited residency and has "received training in the performance of surgical abortions or other gynecological surgery" is "deemed to have sufficient training" to perform first-trimester surgical abortion.

94.    In fact, legal abortions in the United States can be, and in other states are, provided by healthcare providers with a variety of credentials and training, including specialist physicians, primary care physicians, certified nurse midwives, and nurse practitioners.  Limiting the type of healthcare professionals who may provide abortion care in Louisiana does nothing to advance or improve women's health and only limits the availability of abortion providers and women's access to abortion in the state.  As applied to qualified, trained professionals who are not board-certified ob/gyns or family physicians, these laws have no medical benefit.

95.    Patients can be and frequently are given pills or tablets by healthcare providers under the guidance and supervision of their physicians—but LDH makes this illegal for abortion. Moreover, a wide variety of healthcare providers, including but not limited to surgeons, adolescent pediatricians, and advance practice clinicians (such as nurse practitioners or certified nurse midwives) can be trained to provide medication and aspiration abortion care as safely and effectively as ob/gyns or family physicians.  Conversely, abortion training is not a part of most family practice residencies, and no knowledge of abortion care is required to maintain either an ob/gyn or family practice board certification.

96.    Although abortion care is provided safely, effectively, and consistently with medical standards by a range of healthcare providers, these provisions of Louisiana law arbitrarily prohibit advanced practice clinicians from providing abortion care in the state.  The restrictions in **La. Rev. Stat. §§ 14:32.9, 14:32.9.1, 40:1061.10(A)(1)** do not provide any health benefits; they simply limit a woman's choice of provider and unnecessarily narrow the number and type of providers that an abortion facility, like Hope, can employ.

97.    Another statute, **La. Rev. Stat. § 40:1061.10(D)(1)**, and another regulation, **La. Admin. Code tit. 48, § 4431**, restrict to a physician or the physician's agent certain tasks, such as obtaining so-called "informed consent" and providing the state-mandated pre-abortion scripted ultrasound.  These two limitations are also medically unnecessary; they do nothing to advance health and instead only impose obstacles to providing and accessing abortion care by restricting who can perform state-mandated tasks related to that care.

98.    There is no medical reason to mandate that an ultrasound be performed by the physician or the physician's agent, as **La. Rev. Stat. § 40:1061.10(D)(1)** and **La. Admin. Code tit. 48, § 4431(E)** require.  Requiring the physician who performs the abortion or his or her agent

(with documented proficiency in using an ultrasound machine) to perform the ultrasound twenty-four hours in advance of the abortion procedure deprives women of the ability to access healthcare from competent providers like other patients in the state.  Although patients can and frequently do receive ultrasounds from technicians or other capable healthcare providers, who then electronically send the results to the patients' physicians, LDH prohibits this practice for abortion. The State requires abortion patients alone to travel to the clinic at least twice, separated by twenty-four hours: once for the ultrasound and then for the procedure.

99.    To comply with these informed consent and ultrasound requirements, Hope employs physicians to provide the state-mandated patient lecture and scripted ultrasound twenty-four hours prior to any abortion procedure.

100.    The limitations on who may provide abortion care in **La. Rev. Stat. §§ 14:32.9, 14:32.9.1 40:1061.10(A)(1), 40:1061.10(D)(1)** and **La. Admin. Code tit. 48, §§ 4423, 4431, and 4433** do nothing to advance or improve women's health and only limit the availability of abortion providers and women's access to abortion in the state.

### 4.    Redundant Or Unnecessary Testing And Interference With Care

101.    **La. Rev. Stat. §§ 40:1061.10(D)(1), 40:10.61.11** and **La. Admin. Code tit. 48, §§ 4431, 4433, 4435(C)** and **4437(A)(4)–(5), (B)(1)** impose needless requirements on how care is provided to patients.  The Sham Health Statutes and OAFLL Regulations usurp health professionals' ability to exercise their sound medical judgment and serve the needs of their individual patients in favor of a regimented system that cannot be tailored to a particular patient's needs.  These requirements unduly burden women's ability to obtain abortions by increasing the time, cost, and intrusion of obtaining an abortion without any concomitant medical benefit.

102.    Four of OAFLL's regulations, **La. Admin. Code tit. 48, §§ 4431(A)–(C), (E),** require redundant, intrusive, and medically unnecessary testing that provides no medical benefit. **Sections 4431(A)–(C)** and **(E)** require that in order to confirm and gestationally date a pregnancy, a woman must receive a compulsory vaginal examination, a compulsory urine or blood test, and a compulsory ultrasound by the physician or his or her agent at least twenty-four hours before the procedure, at which time the woman must be offered the option of requesting an ultrasound image. **Section 4431(C)** also mandates that certain lab tests be performed within 30 days prior to the abortion procedure, without any personalized healthcare determination from the patient's healthcare provider. In addition, **La. Rev. Stat. § 40:1061.10(D)(1)** places needless requirements on how the mandated ultrasound must be performed, requiring the physician to deliver and the patient to endure a lengthy script describing the ultrasound procedure.

103.    Performing three separate tests to confirm a pregnancy is medically unnecessary; a urine test or ultrasound alone provide a physician or technician with the information necessary to confirm a pregnancy.

104.    Likewise, the State mandates a Rh Factor blood test within 30 days of an abortion for every patient—even though a person's blood type remains the same throughout her life, and thus a time requirement makes no sense; the provider should be able to judge whether the test is necessary. The time requirement in Section 4431(C) is also divorced from standards of care because hematocrit or hemoglobin determinations must be made a few days before or on the day of the procedure—not 30 days before—because doing so would render the test invalid.

105.    Further, healthcare providers are required to administer an ultrasound, display the image, and give a detailed, pre-scripted description of what the ultrasound image depicts—even

if the patient objects.  There is no countervailing benefit to these requirements—they do not improve women's health nor is there any medical reason for them.

106.    These medically unnecessary tests are needlessly invasive and waste time and resources resulting in higher costs, which in turn restrict access to abortion.  Delivering scripted information to women, regardless of their personal circumstances or medical needs, is similarly intrusive and a waste of the clinic's already limited resources.

107.    Hope dedicates entire days of the week to compulsory pre-abortion lectures and scripted ultrasounds, adding to the time and cost required to provide or obtain an abortion. Patients must endure these lectures, whether or not they need or want to hear them.  In the absence of such requirements, Hope could pass on savings to patients and offer additional services, such as abortion care on the days now entirely devoted to these requirements.

108.    **La. Admin. Code tit. 48, § 4431(G)** imposes many detailed requirements to satisfy informed consent, including requiring certain information to be conveyed orally and in person by a physician.  Mandating that informed consent is obtained only after specific information is conveyed, orally and in person, and by a physician, irrespective of the healthcare provider's judgment and the patient's individual circumstances, creates additional costs and burdens to the abortion procedure with no added benefits.

109.    **La. Rev. Stat. § 40:1061.11** and **La. Admin. Code tit. 48, § 4433** impose requirements on the administration of medication abortion.  Patients can be and frequently are given pills or tablets by healthcare providers under the guidance and supervision of their physicians—but LDH makes this illegal for abortion.  Moreover, the statute imposes requirements, including that a physician must be present in the room when a patient is handed the medication, that are not on the Mifeprex label, and have no scientific or medical basis for the

protection of patient health.  Although they provide no benefits, these requirements force abortion facilities to waste resources and make abortion more expensive and less accessible.

110.    **La. Admin. Code tit. 48, § 4435(C)** imposes an unnecessary mandate that a licensed nurse be in each procedure room at all times when an abortion is performed, even though medical assistants would be qualified to perform such monitoring.  This requirement provides no medical benefits, and imposes significant costs.

111.    The nursing requirements significantly increase operating costs on licensed facilities.  Licensed nurses are paid at higher rates than, for instance, trained medical assistants. Pursuant to LDH's nursing requirements in Section 4435, Hope has had to double the number of nurses on its schedule to ensure the presence of a licensed nurse in each of two procedure rooms at all times when abortion procedures are performed.  Hiring and training of additional nursing staff has also absorbed staff time, as has maintaining the documentation in nursing staff files that LDH requires.

112.    **La. Admin. Code tit. 48, §§ 4437(A)(4)–(5)** mandate post-operative care provided to patients.  Detailed requirements include mandating that the physician performing the abortion inspect the products of conception and that a licensed nurse assess the patient during recovery and document the results of the assessment.  In addition, **La. Admin. Code tit. 48, § 4437(B)(1)** requires the facility to provide patients with a phone number permitting them access to their medical records 24 hours per day.

113.    These are all medically unnecessary requirements that serve no purpose other than to burden the right to abortion.  These regulations require physicians and registered nurses to perform activities that can be safely accomplished at much less cost by other trained medical professionals.

### 5.     Provision Of False, Misleading, Or Irrelevant Information

114.     Six Louisiana laws require physicians to provide their patients with false, misleading, or irrelevant information.  *See* **La. Rev. Stat. §§ 40:1061.16(B)–(C)** (requiring abortion providers to give their patients materials published by LDH and to obtain and store certifications from their patients that they have received those materials); **La. Rev. Stat. § 40:1061.17(B)** (requiring abortion providers to pass on to their patients materials published by LDH); **La. Rev. Stat. § 40:1061.17(C)(8)** (requiring abortion providers to link to their websites an LDH website); **La. Rev. Stat. § 40:1061.17(G)** (requiring abortion providers to certify that they have given their patients LDH's published materials); **La. Admin. Code tit. 48, § 4431** (requiring that patients be provided with particular information in the course of obtaining abortion care).  Each of these six laws violates the ordinary norms of medical care and endangers women's health.  Louisiana does not require any other healthcare provider to convey demonstrably false or materially misleading information to patients.

115.     The written materials that LDH writes and obliges abortion facilities to give to their abortion patients contain numerous false, misleading, or irrelevant statements.  These statements also appear on LDH's website, to which LDH mandates abortion facilities link their own websites.  Health professionals providing care other than abortion care in Louisiana are not required to provide false, misleading, or irrelevant information to patients before procedures.

116.     For example, state-drafted materials include deceptive statements inflating the risk of abortion complications and the potential impact on future fertility.  LDH requires the provision of false—and inflammatory—statistics that associate abortion with breast cancer, depression, and suicide, despite well-documented evidence to the contrary

117.     Other untruthful statements involve medication abortion, including that it is "designed to end pregnancies up to 49 days after the last menstrual period," that "[a]ccording to

the FDA, the abortion pill has not been studied in women who are heavy smokers," and that "[i]t is important to understand the need for two follow-up visits with your health care provider" after medication abortion. Patients rely on their healthcare providers to give them accurate information based on medical evidence and their individualized health needs. There is no medical benefit to providing patients with false, misleading, or irrelevant statements about abortion.

118.    Requiring healthcare providers to make false, misleading, or irrelevant statements to their patients and certify that they have given patients this information on its face harms public health and further violates the ordinary norms of medical care. It prevents healthcare providers from exercising their professional judgment. It disrupts the private relationship between doctor and patient by breaking their trust.

119.    Requiring healthcare providers to disseminate false, misleading, and irrelevant statements to patients seeking abortion care has no medical benefit and is inherently unduly burdensome.

### 6.    Invasive And Disruptive Survey And Inspection Practices And Penalties

120.    **La. Rev. Stat. § 40:2175.6** and **La. Admin. Code tit. 48, §§ 4407, 4417, 4423, 4425,** and **4431** place needless burdens on outpatient abortion facilities by subjecting them to an unpredictable, limitless, burdensome, and needlessly intrusive inspection regime. *See, e.g.*, **La. Rev. Stat § 40:2175.6(F)** (permitting LDH to perform on-site inspections "at reasonable times as necessary to ensure compliance"); **La. Admin. Code tit. 48, § 4407(A)–(D)** (survey requirements), **4417** (allowing immediate suspension of the license of an outpatient abortion facility).

121.    On its face and as applied by LDH, OAFLL effectively allows LDH to shut down an outpatient abortion facility for *any* violation of *any* provision of *any* law or regulation, no matter how small or irrelevant to patient health or clinical care.  There is no need for the failure to be substantial and there are no limits on which statutory provisions trigger the right to shut down the facility.  *See* **La. Rev. Stat. § 40:2175.6(G)**; **La. Admin. Code § 4407**.

122.    Nor are there any limits on the number of inspections performed by LDH, which require no notice to the clinic prior to inspection.  These inspections occur without the opportunity for pre-compliance review by a neutral decision-maker.

123.    Moreover, LDH has broadly interpreted its ability to conduct inspections of outpatient abortion facilities and conducts such inspections without warrant.  These inspections—unlike inspections of other healthcare providers—subject outpatient abortion facilities to the risk of immediate suspension or loss of license for minor violations.  Since 2003, under its authority pursuant to OAFLL, LDH has conducted numerous warrantless inspections of abortion clinics.

124.    These inspections take the form of LDH on-site licensing surveys, including initial licensing and annual re-licensing surveys, surveys in response to complaints made by any person, and follow-up surveys to ensure compliance with any plans of correction made in response to deficiencies alleged in prior surveys.

125.    LDH has exercised its inspection authority under OAFLL without restraint.  At times, LDH has instigated investigations solely in response to unfounded complaints submitted by anti-choice advocates.  These advocates have not received care from, or even entered, the clinics about which they complain, and their sole goal is to close all abortion clinics within the state.

126.    During a survey, a facility must allow surveyors access to broad categories of information, including "any and all requested documents and information on the licensed premises, including but not limited to patient medical records," interviews with "any staff or other persons as necessary or required," and "all books, records or other documents maintained by or on behalf of the outpatient abortion facility." **La. Admin. Code tit. 48, §§ 4407(B)–(C)**.

127.    Upon information and belief, surveyor discretion is not properly cabined.  Field surveyors go to an abortion facility unannounced and with no LDH-approved survey tool or checklist to guide or limit them in their review.  The survey process differs between surveyors and over time.

128.    Given the vast number of regulatory requirements applicable to clinics, the licensing surveys performed by LDH often last several days and require extensive time and energy from Hope's staff to facilitate.

129.    For example, often every personnel file is examined; numerous patient files are examined; and most, if not all, of Hope's staff members are interviewed.

130.    LDH's authority to interview "other persons as necessary or required" provides unfettered access to clinics.

131.    Surveyors—who may be accompanied by non-department employees—spend time photocopying sensitive and private patient records, protocols, and other clinic documents.

132.    There are no safeguards limiting the use of private, confidential, and/or patient-identifying information obtained during surveys or who has access to this information.

133.    Licensing deficiencies found during surveys can result in serious consequences. Regardless of the severity of the deficiency or whether LDH has determined the deficiency presents any threat to health and safety, LDH can (i) impose fines on a clinic, (ii) revoke its

license, or (iii) refuse to renew its license.  LDH can also (iv) *immediately* suspend a clinic's license for even a single deficiency.  *See* **La. Rev. Stat. § 40:2175.6(G); La. Admin. Code tit. 48, §§ 4407(I)(1)–(5)**.

134.    The regulatory scheme created and enforced by LDH under OAFLL, particularly as it pertains to surveys and inspectors' unfettered access to clinics, is so burdensome and complex that it is extremely difficult for Hope and similar small medical practices to comply. The number, nature, and complexity of the regulations and aggressive approach to inspection and enforcement subjects facilities, including Hope, to the constant risk of sanctions or loss of license.

135.    By imposing inappropriate and voluminous regulatory requirements on small outpatient facilities through the OAFLL Regulations, LDH virtually ensures that minor clerical oversights will occur for which the clinic can face these serious sanctions, even though the oversight has no bearing on health and safety and notwithstanding the significant time and resources spent by Hope employees on compliance with the regulatory requirements in lieu of patient care.

136.    LDH's position that it has the discretion to suspend or revoke a clinic's license for any alleged violations of any laws, rules, or regulations, including its own, without regard to whether the violation presents any risk to patient health or safety, has reduced access to abortion in Louisiana.

137.    LDH has previously abused its authority to revoke Hope's and other clinics' licenses on the bases of regulatory technicalities.

138.    For example, in September 2010, LDH suspended Hope's license without prior notice based on alleged violations of LDH's regulations regarding the administration of sedation.

LDH did so even though the allegations regarding sedation had been made by an LDH surveyor nearly a month before the suspension, during the course of an inspection, and even though Hope had amended its sedation protocol immediately, with the surveyor still present. The surveyor's own notes identify the time of the so-called "immediate jeopardy" as 9:20 a.m. and acknowledge that it was "removed at 10:35 am," just over an hour later.  Hope amended the protocol on the spot to accommodate LDH's concern, even though the protocol was long-standing and had been disclosed to numerous LDH surveyors, without objection or concern, during prior inspections.

139.    Nearly a month after the inspection, LDH then exercised its authority to immediately strip Hope of its license, based on the sedation protocol as allegedly violative of "any" federal, state, or local law, rule, or regulation.  At 5:00 p.m. the Friday before Labor Day, September 3, 2010, LDH simultaneously issued a press release stating it had suspended and revoked Hope's license and sent a fax to Hope stating that its license had been suspended effective immediately and a revocation hearing had been set for the following month.

140.    As a result of LDH's suspension and revocation of its license, Hope was forced to close for three weeks and to engage in years of litigation that eventually culminated in a settlement agreement lifting the suspension and revocation.

141.    LDH's aggressive enforcement and abuse of technical requirements continued in 2011 when, in another particularly egregious notice of violation, LDH alleged that Hope had not satisfied its requirement to "develop[] disaster plans for both internal and external occurrences" and to hold and document "annual drills" in accordance with the plan, even though Hope had provided LDH surveyors with both its "fire drill, tornado and bomb threat policy" and documentation of its annual evacuation drills.  LDH alleged, without offering a reason, that even though Hope had a policy for fires, tornados and bombs, the clinic lacked a "disaster plan," and

further, that Hope's documented annual "evacuation drills" were insufficient to satisfy the requirement to hold and document drills.  LDH even retroactively relied on these allegations regarding the supposed inadequacy of the "disaster" plan to support its 2010 decision to revoke Hope's license.

142.    LDH's aggressive enforcement tactics of the requirements imposed pursuant to OAFLL have forced other clinics to close permanently.  Since LDH first issued regulations pursuant to OAFLL in 2003, it has suspended or revoked the operating licenses of several outpatient abortion facilities.

143.    Upon information and belief, in July 2012, LDH revoked the license of Midtown Medical, LLC, a licensed abortion facility in New Orleans, based on allegations made in the course of an unannounced, warrantless survey pursuant to OAFLL that had occurred nearly two months prior, stating that any corrective actions taken during or subsequent to the inspection would have no bearing on its irrevocable decision.

144.    Similarly, upon information and belief, the license of Gentilly Medical Clinic for Women, a licensed abortion facility in New Orleans, was revoked by LDH in January 2010, because it lacked a site-specific license from the United States Drug Enforcement Administration ("DEA"), as required by LDH's regulations issued under OAFLL, even though LDH was aware that the facility did not prescribe any narcotic medication for which such a license would actually be required by the DEA.

145.    The burdens of either complying with LDH's legally and medically unnecessary demands or contesting the deficiency statements through a lengthy and expensive legal process has forced outpatient abortion clinics to close.  This has been especially true where clinics have been cited inconsistently by surveyors, as clinics could not compare protocols because surveys

44

and surveyors were subjective and inconsistent.  This also caused much frustration among the clinic owners seeking to comply with the laws.

146.    Upon information and belief, Bossier City Medical Suite ("Bossier"), a licensed outpatient abortion facility in Bossier City, closed in April 2017 after LDH sought to impose costly requirements regarding how Bossier kept and maintained medical records.  Causeway Medical Clinic ("Causeway"), a licensed outpatient abortion facility in Metairie, closed in February 2016 after an unconstitutional requirement that its physicians obtain admitting privileges at a nearby hospital briefly became enforceable by LDH against Causeway's primary physician.

147.    As a result of LDH's application of OAFLL, the number of licensed abortion providers has fallen precipitously in the state in recent years. Currently, the number of licensed abortion facilities in Louisiana has dropped to three—from eleven in 2000, the last full year before OAFLL was passed, and seven as recently as 2011.

148.    In addition, with each inspection looms the possibility of criminal penalty.  Upon information and belief, LDH refers inspection findings to various law enforcement and professional agencies, including the Louisiana Attorney General's Office, the Louisiana Office of the Inspector General, local district attorney's offices, the LSMBE, the DEA, and the Federal Bureau of Investigations.  Upon information and belief, LDH also forwards complaints to law enforcement (including those submitted by anti-choice advocates) even when LDH has been unable to substantiate the complaints through its own inspections.

149.    On information and belief, Benjamin Clapper, the Executive Director of Louisiana Right to Life, specifically requested that the findings from a February 2011 inspection of Delta Medical Clinic be forwarded to the LSBME, the East Baton Rouge District Attorney's

office, the DEA, and the Office of the Inspector General.  Following that request, LDH referred the matter to each of those offices.

150.    The threat of arbitrary criminal prosecution, like so many of the other myriad requirements under Louisiana's regulatory scheme, discourages capable healthcare providers from providing abortion care, thereby limiting Louisiana women's access to essential healthcare.

151.    This broad authority to inspect and suspend the license of an outpatient abortion facility exists even though extremely safe interventions are performed at such facilities.

152.    By comparison, to suspend or revoke a hospital's license—a setting where far riskier procedures are provided—LDH must establish a "*substantial failure* of the applicant or licensee to comply" with *specific* statutory and regulatory provisions.  La. Rev. Stat. § 40:2110(A) (emphasis added).  Physicians providing healthcare of similar or greater risk to abortion care in Louisiana are not subject to such burdensome, intrusive, and costly licensing and survey requirements.  Those requirements are reserved for abortion and abortion alone.

**B.    Each Of The Challenged Laws and Regulations Restricts Abortion Access To The Detriment Of Women's Health**

153.    LDH, through the OAFLL Regulations and Sham Health Statutes, has imposed such barriers to operation that most of Louisiana's abortion facilities have closed since OAFLL was enacted.  Upon information and belief, no new outpatient abortion facility has received a license since at least 2008.

154.    LDH has also manipulated the licensing process so as to delay and frustrate the opening of new clinics.  *See, e.g.*, *Planned Parenthood Gulf Coast v. Gee*, No. 3:18-cv-00176 (M.D. La. Feb. 23, 2018).

155.    Hope, in Shreveport, is the sole abortion clinic remaining in the northern part of the state.  Louisiana's two other abortion clinics are in the southeastern part of the state (Baton

Rouge and New Orleans), leaving central, northeastern, and southwestern Louisiana without a single abortion provider.

156.    The dwindling number of abortion providers in the state makes access to abortion extremely difficult.  In fact, Louisiana ranks among the lowest in the entire country in terms of access, with about 312,000 women per clinic, when evaluating the ratio of the remaining abortion clinics in the state to the population of women of reproductive age (935,000 women and 3 clinics).  This ratio is on par with Texas's *at its worst*, when nearly half of that state's clinics closed after the unconstitutional House Bill 2 was enacted—318,000 women per clinic.

157.    As with any healthcare service with limited availability, the lack of providers of abortion care in Louisiana erects barriers to access that can delay or even prevent women from obtaining care.  About three-quarters of Louisiana women live in parishes with no abortion provider.  Women in these parishes cannot access abortion services in their community and cannot obtain the service from their regular primary care provider, if they have one; in each of these parishes women are forced to travel outside of their communities in order to access abortion care.

158.    Forcing women to travel outside of their communities does nothing to protect or advance women's health and only imposes additional risks and burdens on the ability to obtain care.

159.    Shrinking access has significantly increased travel distances and time spent in transit for Louisiana women seeking abortion.  These logistical burdens manifest not only in the form of lost time, but also in the form of extreme financial costs beyond the cost of the abortion—lost wages, overnight and travel expenses, and childcare costs.

160.    Due to the requirement that a woman make an initial visit to a clinic to receive an ultrasound and counseling from "the physician" who will provide the abortion, or the physician's "agent," women must travel to the facility twice, or arrange for overnight lodging at their own expense.  Even relatively short distances—30 to 50 miles, for example—can present significant challenges for low-income women who must find or save for a ride to the clinic, other travel expenses, childcare, and must request time off work.

161.    For many women in low-wage jobs, a two-day absence from work could result in significant lost wages or even jeopardize their employment status.  Women who experience domestic violence will have to explain increased absence from home, placing themselves at risk for further violence.

162.    On top of the financial burden imposed by extended travel, the elevated cost of abortion itself delays or prevents many women from accessing care.

163.    Very few women in Louisiana have insurance that covers abortion services.  Health insurance purchased through the state exchange is not allowed to cover abortion.  Public funds may not be used to pay for abortion except when a woman's life is in danger or when she has reported being a victim of rape or incest both to law enforcement and to a physician who has certified the report.  Thus, the majority of women must pay for abortion services out-of-pocket.

164.    The complexity and the duration of the procedure, and consequently its costs, begin to increase after a certain point in gestational age—after eleven weeks from the patient's last menstrual period at Hope.

165.    The tremendous financial and logistical burdens involved in securing travel and funding for the procedure fall particularly hard on low-income women.  Women seeking abortion are disproportionately poor: approximately forty-nine percent of women having abortions in the

48

United States in 2014 subsisted below the federal poverty line. Another twenty-six percent are low-income, with incomes at 100 to 199 percent of the poverty level. In Louisiana, three-fourths of all abortion patients are low-income (i.e., have incomes less than 199 percent of the federal poverty level). For low-income women, any increase in the cost of abortion can make the difference in obtaining an abortion and being forced to carry to term.

166.    Louisiana is the third-poorest state in the nation, with the nation's third-highest levels of overall and child poverty. Women in Louisiana are much more likely than men to be poor—more than half of Louisianans living below the federal poverty line are women, including nearly a quarter of a million women of child-bearing age. Women who are living at or below the poverty line do not earn enough to cover their monthly expenses and often do not have enough at the end of each month to buy food and pay their bills.

167.    The obstacles posed by restrictive abortion laws, and by limited access to reproductive healthcare, disproportionately affect women and communities of color. Nationwide reports indicate that of women who obtain abortions, approximately thirty-nine percent are white; twenty-eight percent are Black; twenty-five percent are Hispanic; and nine percent come from other racial or ethnic backgrounds.

168.    The limited options for providers, the need to travel for care, and the increased costs of medical care from providers operating under onerous regulatory restrictions together result in delays for women in obtaining abortion care.

169.    Although abortion is extremely safe throughout pregnancy, complication rates increase with gestational age, and because of the risks inherent in remaining pregnant for a longer time, delays in obtaining an abortion are associated with increased risk of complications for the patient.

170.    There are certain points in pregnancy at which the procedure may become more complex or fewer options may be available.  If a woman is delayed past the cutoff gestational date point at which medication abortion is available—currently, ten weeks gestation according to the current Mifeprex's label (the medication used in combination with misoprostol for medication abortion), although some clinics, such as Hope, use a slightly earlier date—she may be unable to obtain her desired method of abortion, and her remaining option will be an abortion procedure.  Medication abortion may be clinically preferred for some patients.  A patient seeking aspiration abortion may also be delayed into having a procedure at a later date, at a higher cost, and with a higher, albeit still low, risk of complication.

171.    Lack of access to abortion ultimately causes more women to carry unwanted pregnancies to term, which carries its own health risks that are far greater than those of abortion.

172.    The challenged laws and regulations do not just limit women's access to abortion.  They have also undermined the health of women in Louisiana more generally by causing some healthcare providers, especially ob/gyns, to leave the state in search of a less arbitrary and stigmatizing regulatory environment.  By creating a hostile and unwelcoming regulatory environment for providers of women's reproductive healthcare, the State has decreased access to reproductive healthcare generally.

173.    In addition, delay in accessing abortion care increases anxiety and suffering for many women, regardless of economic status.  Women seek abortion care for a variety of reasons, psychological, emotional, medical, familial, social, and economic.  These include financial hardship, concern for the number and spacing of their children, pregnancies that threaten their lives or health, and rape, among other reasons.  Delay forces women to continue to endure the

physical and psychological burdens of pregnancy despite their decision to terminate the pregnancy.

174.    By reducing access to abortion through its laws, regulation and enforcement strategies, the State has also increased the risk that women will seek out and obtain abortion illegally.

175.    By imposing medically unnecessary, burdensome regulations on outpatient abortion facilities and their providers, and drastically limiting the ability of healthcare providers other than at outpatient abortion facilities to provide abortion services, each of OAFLL, the OAFLL Regulations, and the Sham Health Statutes (i) reduce the number and availability of abortion providers in the state, thereby decreasing Plaintiffs' patients' access to abortion services; (ii) increase the complexity, invasiveness, and duration of abortion without regard to the individual medical and financial circumstances of individual patients, and (iii) increase costs for outpatient abortion facilities, which must in turn be passed on to Plaintiffs' patients.

**C.    Singling Out Abortion For Burdensome And Unnecessary Regulation Serves No Medical Purpose**

176.    Through OAFLL and the OAFLL Regulations, Louisiana law singularly targets abortion providers for onerous regulation of an extremely safe medical intervention.  These regulations and statutes are directly at odds with OAFLL's purported aim of serving the "health, safety, and welfare of women."

177.    As discussed *supra,* ¶¶ 28–32, abortion is a safe and essential part of reproductive healthcare with a low risk of complications.  Aspiration abortion is minimally invasive and does not require any incision or general anesthesia, involving only a cannula inserted into the uterus and application of suction.  Medication abortion involves the ingestion of pills orally by the patient twenty-four to forty-eight hours apart.

178.    Yet each of OAFLL and the OAFLL Regulations subjects abortion providers—and only abortion providers—to extensive and burdensome regulation and oversight.

179.    By their terms, OAFLL and the OAFLL Regulations do not apply to providers of outpatient medical interventions of similar, or greater, risk than abortion.

180.    Rather, providers of comparatively—or even less—safe outpatient medical interventions, such as ob/gyns, gastroenterologists, urologists, family practitioners, and cosmetic surgeons, are not subject to OAFLL, or to any other similar broad facility licensing regime and regulations.  They can perform outpatient procedures of similar or greater risk and invasiveness, such as liposuction, colonoscopies, cystoscopies, endometrial ablations, and ureteroscopies at unlicensed facilities, including in their own offices.

181.    At most, physicians performing office-based surgery are subject to a limited set of office-based surgery requirements that involve far less detail, burden, and regulatory discretion than OAFLL and the OAFLL Regulations.  *See* La. Admin. Code tit. 46, § 7301 *et. seq.*; *see also id.* § 7303 (office-based surgery regulations apply to surgical procedures, defined as "the excision or resection, partial or complete destruction, incision or other structural alteration of human tissue by any means . . . .").  Given the nature of the medical intervention involved, abortion would be subject to these limited "office-based surgery" regulations, at most, if it were not specifically carved out and subject to OAFLL and the OAFLL Regulations instead.

182.    Moreover, were it not specifically carved out and subject to targeted, burdensome licensing regulations, abortion could be provided by ob/gyns in their offices as part of the full range of reproductive healthcare and medical interventions that those providers otherwise offer, including interventions of comparable risk such as pap smears, endometrial ablations, tubal ligations, cervical and uterine biopsies, colposcopies, hysterosalpingograms, and IUD insertions.

183.    Segregating abortion from these other forms of care and barricading it behind the obstacle course of OAFLL, the OAFLL Regulations, and the Sham Health Statutes serves no medical purpose; it simply makes abortion much harder to provide and obtain.

## FIRST CLAIM FOR RELIEF
### (Substantive Due Process – Rights to Liberty and Privacy –  OAFLL)

184.    The allegations of paragraphs 1 through 183 are incorporated as though fully set forth herein.

185.    OAFLL, as codified in **La. Rev. Stat. §§ 40:2175.1–2175.6** and the term "outpatient abortion facility" in **La. Rev. Stat. § 40:2199(A)(1)**, including as applied through its implementing OAFLL Regulations, violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

## SECOND CLAIM FOR RELIEF
### (Substantive Due Process – Rights to Liberty and Privacy – OAFLL Regulations)

186.    The allegations of paragraphs 1 through 183 are incorporated as though fully set forth herein.

187.    Each of the challenged OAFLL Regulations, listed below, violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

a.    **La. Admin. Code tit. 48, §§ 4401, 4403, 4411** violate Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because they impose an undue burden on women's right to choose abortion before viability.

53

b. **La. Admin. Code tit. 48, § 4407** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

d. **La. Admin. Code tit. 48, § 4417** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

e. **La. Admin. Code tit. 48, § 4423** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

f. **La. Admin. Code tit. 48, § 4425** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

g. **La. Admin. Code tit. 48, § 4431** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

h. **La. Admin. Code tit. 48, § 4433** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States

Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

i. **La. Admin. Code tit. 48, § 4435(C)** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

j. **La. Admin. Code tit. 48, § 4437(A)(4)–(5)** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

k. **La. Admin. Code tit. 48, § 4437(B)(1)** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

l. **La. Admin. Code tit. 48, § 4445** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

### THIRD CLAIM FOR RELIEF
**(Substantive Due Process – Rights to Liberty and Privacy – Sham Health Statutes)**

188.    The allegations of paragraphs 1 through 183 are incorporated as though fully set forth herein.

189.    Each of the challenged Sham Health Statutes, listed below, violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to

55

the United States Constitution, because each imposes an undue burden on women's right to choose abortion before viability.

a. **La. Rev. Stat. § 14:32.9** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

b. **La. Rev. Stat. § 14:32.9.1** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

c. **La. Rev. Stat. § 40:1061.10(A)(1)** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

d. **La. Rev. Stat. § 40:1061.10(D)(1)** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

e. **La. Rev. Stat. § 40:1061.11** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

f. **La. Rev. Stat. § 40:1061.16(B)–(C)** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

g. **La. Rev. Stat. § 40:1061.17(B)** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

h. **La. Rev. Stat. § 40:1061.17(C)(8)** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

i. **La. Rev. Stat. § 40:1061.17(G)** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

j. **La. Rev. Stat. § 40:1061.19** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

k. **La. Rev. Stat. § 40:1061.21** violates Plaintiffs' patients' right to liberty as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on women's right to choose abortion before viability.

## FOURTH CLAIM FOR RELIEF
### (Fourth Amendment – Protection Against Unreasonable Searches)

190.    The allegations of paragraphs 1 through 183 are incorporated as though fully set forth herein.

191.    By inflicting unannounced, warrantless, lengthy, and intrusive inspections on abortion facilities, in the absence of probable cause to believe that any violation has occurred,

and without giving the clinic an opportunity for pre-compliance review before a neutral decision-maker, OAFLL violates Plaintiffs' and their patients' Fourth Amendment right to be free from unreasonable searches.

**FIFTH CLAIM FOR RELIEF**
**(Equal Protection – Providers of Abortion Care)**

192.    The allegations of paragraphs 1 through 183 are incorporated as though fully set forth herein.

193.    When considered alongside Louisiana's other regulatory schemes, OAFLL, the OAFLL Regulations, and the Sham Health Statutes violate Plaintiffs' rights to equal protection of laws by singling out abortion from all other medical procedures.  By subjecting Plaintiffs to more burdensome requirements than similarly situated providers of medical services, with no corresponding benefit, medical or otherwise, the laws arbitrarily and irrationally deprive Plaintiffs of their rights to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

**ATTORNEY'S FEES**

194.    Plaintiffs are entitled to an award of reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988.

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court:

1.   Issue a declaratory judgment that:

   a.   La. Rev. Stat. §§ 40:2175.1–2175.6 and the term "outpatient abortion facility" in La. Rev. Stat. § 40:2199(A)(1) are unconstitutional under the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution and in violation of 14 U.S.C. § 1983 on their face and/or as applied

58

and/or enforced by LDH through its implementing regulations and enforcement practices;

b. Each OAFLL Regulation, La. Admin. Code tit. 48, §§ 4401, 4403, 4407, 4411, 4417, 4423, 4425, 4431, 4433, 4435(C), 4437(A)(4)–(5), 4437(B)(1), and 4445, is unconstitutional under the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution and in violation of 14 U.S.C. § 1983 on its face and/or as-applied and/or enforced by Defendants through their enforcement practices;

c. Each of La. Rev. Stat. §§ 14:32.9, 14:32.9.1 and La. Rev. Stat. §§ 40:1061.10(A)(1), 40:1061.10(D)(1), 40:1061.11, 40:1061.16(B), 40:1061.16(C), 40:1061.17(B), 40:1061.17(C)(8), 40:1061.17(G), 40:1061.19, and 40:1061.21, is unconstitutional, under the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution and in violation of 14 U.S.C. § 1983 on their face and/or as applied and/or enforced by Defendants through their enforcement practices;

d. Each of La. Rev. Stat. §§ 40:2175.1–2175.6 and the term "outpatient abortion facility" in La. Rev. Stat. § 40:2199(A)(1) is unconstitutional and unenforceable under the Fourth Amendment to the United States Constitution and in violation of 14 U.S.C. § 1983 to the extent they permit LDH to engage in unreasonable searches of licensed abortion facilities;

2. Issue permanent injunctive relief, without bond, restraining Defendants, and their employees, agents, and successors in office from enforcing any challenged law that is declared unconstitutional and/or:

a. enforcing La. Rev. Stat. §§ 40:2175.1–2175.6 and the term "outpatient abortion facility" in La. Rev. Stat. § 40:2199(A)(1);

b. engaging in unreasonable searches of facilities licensed pursuant to La. Rev. Stat. §§ 40:2175.1–2175.6 and the term "outpatient abortion facility" in La. Rev. Stat. § 40:2199(A)(1);

c. enforcing La. Rev. Stat. §§ 14:32.9, 14:32.9.1; La. Rev. Stat. §§ 40:1061.10(A)(1), 40:1061.10(D)(1), 40:1061.11, 40:1061.16(B), 40:1061.16(C), 40:1061.17(B), 40:1061.17(C)(8), 40:1061.17(G), 40:1061.19, and 40:1061;

d. enforcing the OAFLL Regulations, La. Admin. Code tit. 48, §§ 4401, 4403, 4407, 4411, 4417, 4423, 4425, 4431, 4433, 4435(C), 4437(A)(4)–(5), 4437(B)(1), and 4445;

3. Grant Plaintiffs' reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable laws and rules; and

4. Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated: June 11, 2018

Respectfully submitted,

*/s/ Larry Samuel*
Charles M. (Larry) Samuel III
RITTENBERG, SAMUEL & PHILLIPS, LLC
715 Girod Street, Suite 100
New Orleans, LA 70130
Office: (504) 524-5555 x 17
Cell: (504) 715-0484
Fax: (504) 524-0912
Email: samuel@rittenbergsamuel.com

Jenny Ma*
Caroline Sacerdote*
Alexandra S. Thompson**
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, New York 10038
Phone: (917) 637-3600
Fax: (917) 637-3666
Email: jma@reprorights.org

Shannon Rose Selden*
Amanda M. Bartlett*
Zachary Saltzman**
DEBEVOISE & PLIMPTON LLP
919 Third Ave
New York, New York 10022
Phone: (212) 909-6000
Fax: (212) 909-6836
Email: srselden@debevoise.com

*Admitted *Pro Hac Vice*
** *Pro Hac Vice* Motion Forthcoming

ATTORNEYS FOR PLAINTIFFS